ACCEPTED
12-15-00141-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
6/24/2015 5:23:20 PM
CATHY LUSK
CLERK

## No. 12-15-00141-CV

_____

IN THE COURT OF APPEALS
TWELFTH JUDICIAL DISTRICT OF TEXAS
TYLER, TEXAS

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
6/24/2015 5:23:20 PM
CATHY S. LUSK
Clerk

_____

MORRISON SUPPLY COMPANY, LLC and PATRIOT SUPPLY
HOLDINGS, INC.

v.

SCOTT HILBURN and MIKE ANTHONY

_____

**BRIEF OF APPELLANTS**

_____

*On Appeal from the 7th Judicial District Court,*
*Smith County, Texas*
*Trial Court No. 15-0792-A*

_____

Michael E. Starr
 State Bar No. 19078400
COGHLAN CROWSON LLP
1127 Judson Road
Suite 211
Longview, Texas 75606
903.758.5543
mstarr@ccfww.com

Vanessa Griffith
 State Bar No. 00790469
Thomas S. Leatherbury
 State Bar No. 12095275
Stephen S. Gilstrap
 State Bar No. 24078563
VINSON & ELKINS LLP
2001 Ross Avenue
Suite 3700
Dallas, Texas 75201
214.220.7713
214.999.7713 (facsimile)
vgriffith@velaw.com
tleatherbury@velaw.com
sgilstrap@velaw.com

*Attorneys for Appellants Morrison Supply Company, LLC and Patriot Supply*
*Holdings, Inc.*

Oral Argument Requested                                    June 24, 2015

**Appellants Morrison Supply Company, LLC and Patriot Supply Holdings, Inc.**

Vanessa Griffith
  State Bar No. 00790469
Stephen S. Gilstrap
  State Bar No. 24078563
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
214-220-7713
vgriffith@velaw.com
sgilstrap@velaw.com

Michael E. Starr
  State Bar No. 19078400
COGHLAN CROWSON LLP
1127 Judson Road, Suite 211
P.O. Box 2665
Longview, Texas 75606
903-758-5543
mstarr@ccfww.com

**Appellees Scott Hilburn and Mike Anthony**

Trey Yarbrough
  State Bar No. 22133500
Dallas W. Tharpe
  State Bar No. 24052036
YARBROUGH WILCOX, PLLC
100 East Ferguson, Suite 1015
Tyler, Texas 75702
903-595-3111
trey@yw-lawfirm.com
dallas@yw-lawfirm.com

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ............................................................................. ii

TABLE OF CONTENTS ............................................................................................................ iii

INDEX OF AUTHORITIES....................................................................................................... v

RECORD REFERENCES ........................................................................................................ viii

APPENDIX REFERENCES ..................................................................................................... viii

STATEMENT OF THE CASE ................................................................................................... x

STATEMENT REGARDING ORAL ARGUMENT ................................................................ xi

ISSUES PRESENTED ............................................................................................................... xii

STATEMENT OF FACTS .......................................................................................................... 1

I.      Anthony and Hilburn's Employment at Morrison. ...................................... 1

II.     Anthony and Hilburn Sign Nonqualified Stock Option Award
        Agreements in December 2012. ....................................................................... 3

III.    Relevant Terms of the Agreements. ............................................................... 5

IV.     Anthony and Hilburn Breach the Non-Competition and Non-
        Solicitation Provisions in the Agreements. .................................................. 7

V.      The Proceedings Below. .................................................................................. 10

SUMMARY OF THE ARGUMENT ........................................................................................ 12

STANDARDS OF REVIEW ..................................................................................................... 14

ARGUMENT .............................................................................................................................. 15

I.      The Trial Court Abused Its Discretion by Denying Morrison's
        Application for a Temporary Injunction. ..................................................... 15

        A.      The Evidence Shows that Morrison Has a Probable Right to the
                Relief Requested. ................................................................................. 16

                1.      The Non-Competition and Non-Solicitation
                        Provisions Are "Ancillary to or Part of an Otherwise
                        Enforceable Agreement." ....................................................... 17

                2.      The Time and Geographic Scope Restrictions Sought
                        in the Temporary Injunction Are Reasonable. ................. 20

                3.      Anthony and Hilburn Breached Their Non-
                        Solicitation and Non-Competition Obligations. ............... 23

      4.      The Former Managers' Arguments that Morrison Failed to Show an Enforceable Agreement Fail. ......................26

   B.   The Evidence Shows that Morrison Has a Probable, Imminent, and Irreparable Injury for Which There Is No Adequate Remedy at Law; the Trial Court Erred and Abused Its Discretion in Holding Otherwise. ....................................33

      1.      Morrison Has Suffered Irreparable Harm—and Will Continue to Suffer Irreparable Harm—as a Result of the Former Managers' Actions. ...............................35

      2.      The Trial Court's Conclusion Regarding an Adequate Remedy at Law Is Further Undermined by the Fact that the Former Managers Are Employed at National..............38

II.   The Trial Court Erred by Refusing to Reform the Agreements at the Temporary Injunction Stage, Thereby Preventing Morrison from Recovering Certain Damages. ........................................................40

CONCLUSION AND PRAYER ...............................................................44

CERTIFICATE OF COMPLIANCE .................................................................46

CERTIFICATE OF SERVICE.....................................................................46

INDEX OF APPENDIX MATERIALS

# INDEX OF AUTHORITIES

## Cases

*Alex Sheshunoff Mgmt. Servs., LP. v. Johnson*,
209 S.W.3d 644 (Tex. 2006).................................................................. 17, 18, 28

*Argyle Indep. Sch. Dist. ex rel. Bd. of Trustees v. Wolf*,
234 S.W.3d 229 (Tex. App.—Fort Worth 2007, no pet.)....................................16

*Beasley v. Hub City, Tex., L.P.*,
No. 01-03-00287-CV, 2003 WL 22254692 (Tex. App.—Houston [1st Dist] Sept. 29, 2003, no pet.) ....................................................................37

*Bertotti v. C.E. Shepherd Co., Inc.*,
752 S.W.2d 648 (Tex. App.—Houston [14th Dist.] 1988, no writ) ...................43

*Brinks, Inc. v. Patrick*,
No. 3:14-CV-775-B, 2014 WL 2931824 (N.D. Tex. June 27, 2014).................36

*Butler v. Arrow Mirror & Glass*, *Inc.*,
51 S.W.3d 787 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ........................21

*Butnaru v. Ford Motor Co.*,
84 S.W.3d 198 (Tex. 2002).................................................................... 14, 15, 33

*CDX Holdings, Inc. v. Heddon*,
No. 12-CV-126, 2012 WL 11019355 (N.D. Tex. Mar. 2, 2012)........................43

*Curtis v. Ziff Energy Grp., Ltd.*,
12 S.W.3d 114 (Tex. App.—Houston [14th Dist.] 1999, no pet.)......................22

*Davis v. Huey*,
571 S.W.2d 859 (Tex. 1978)..............................................................................14

*DeSantis v. Wackenhut Corp.*,
793 S.W.2d 670 (Tex. 1990)..............................................................................16

*DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*,
112 S.W.3d 854 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).............31

*Elec. Data Sys. Corp. v. Powell*,
508 S.W.2d 137 (Tex. Civ. App.—Dallas 1974, writ ref'd n.r.e.) .....................20

*Fischer v. Rider*,
No. 02-10-00294-CV, 2011 WL 167226 (Tex. App.—Fort Worth Jan. 13, 2011, no pet.)........................................................................................33

*Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*,
  281 S.W.3d 215 (Tex. App.—Fort Worth 2009, pet. denied) ............................36

*Gallagher Healthcare Ins. Servs. v. Vogelsang*,
  312 S.W.3d 640 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ...............20

*Goff v. Tuchscherer*,
  627 S.W.2d 397 (Tex. 1982) (per curiam) .........................................................11

*In re Halliburton Co.*,
  80 S.W.3d 566 (Tex. 2002) ................................................................................27

*In re Int'l Profit Assocs., Inc.*,
  274 S.W.3d 672 (Tex. 2009) ..............................................................................33

*In re Labatt Food Serv., L.P.*,
  279 S.W.3d 640 (Tex. 2009) ..............................................................................15

*In re Odyssey Healthcare, Inc.*,
  310 S.W.3d 419 (Tex. 2010) ..............................................................................28

*In re Tex. Nat'l Res. Conservation Comm'n*,
  85 S.W.3d 201 (Tex. 2002) ................................................................................14

*INEOS Grp. Ltd. v. Chevron Phillips Chem. Co.*,
  312 S.W.3d 843 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ......................15

*Mabrey v. SandStream, Inc.*,
  124 S.W.3d 302 (Tex. App.—Fort Worth 2003, no pet.) ...................................38

*Marsh USA, Inc. v. Cook*,
  354 S.W.3d 764 (Tex. 2011) ...................................................................... 19, 20

*Martin v. Linen Sys. for Hosps., Inc.*,
  671 S.W.2d 706 (Tex. App.—Houston [1st Dist.] 1984, no writ) ......................36

*Poole v. U.S. Money Reserve, Inc.*,
  No. 09-08-137-CV, 2008 WL 4735602 (Tex. App.—Beaumont 2008, no
  pet.) .............................................................................................................. 37, 43

*Rouse v. Tex. Capital Bank, N.A.*,
  394 S.W.3d 1 (Tex. App.—Dallas 2011, no pet.) ..............................................32

*Salas v. Chris Christensen Sys.*,
  No. 10-11-00107-CV, 2011 Tex. App. LEXIS 7530 (Tex. App.—Waco
  Sept. 14, 2011, no pet.) .....................................................................................20

*Stone v. Griffin Commc'ns & Sec. Sys., Inc.*,
  53 S.W.3d 687 (Tex. App.—Tyler 2001, no pet.) ..............................................21

*Tex. Indus. Gas v. Phoenix Metallurgical Corp.*,
828 S.W.2d 529 (Tex. App.—Houston [1st Dist.] 1992, no writ)........................38

*Towers v. Grogan*,
No. 01-97-00946-CV, 1998 WL 191760 (Tex. App.—Houston [1st Dist.]
Apr. 23, 1998, no pet.) .................................................................................38

*TransPerfect Translations, Inc. v. Leslie*,
594 F. Supp. 2d 742 (S.D. Tex. 2009) ...................................................... 22, 42

*Tranter, Inc. v. Liss*,
No. 02-13-00167-CV, 2014 WL 1257278 (Tex. App.—Fort Worth Mar.
27, 2014, no pet.)............................................................... 22, 34, 42, 43

*Wright v. Sport Supply Grp., Inc.*,
137 S.W.3d 289 (Tex. App.—Beaumont 2004, no pet.) ....................... 37, 40, 43

*Wright v. Sydow*,
173 S.W.3d 534 (Tex. App.—Houston [14th Dist.] 2004, pet. denied)..............30

**Statutes**

TEX. BUS. & COMM. CODE § 15.50 ........................................................................16

TEX. BUS. & COMM. CODE § 15.51(c)...................................................... xii, 40, 41

TEX. CIV. PRAC. & REM. CODE § 51.014(a)(4) .......................................................14

## RECORD REFERENCES

Citations to the record will be formatted as follows:

| | | |
|---|---|---|
| (1) | Clerk's Record | CR *Page No.* |
| (2) | Supplemental Clerk's Record | Supp. CR *Page No.* |
| (3) | Reporter's Record for the April 27, 2015 Temporary Injunction Hearing | 2RR *Page:Line Nos.* |
| (4) | Reporter's Record for the April 29, 2015 Temporary Injunction Hearing | 3RR *Page:Line Nos.* |
| (5) | Reporter's Record for the April 30, 2015 Temporary Injunction Hearing | 4RR *Page:Line Nos.* |
| (6) | Exhibit Index for Temporary Injunction Hearing | 5RR, *Exhibit No*. |

## APPENDIX REFERENCES

Citations to the appendix will be formatted as follows:

| | | |
|---|---|---|
| (1) | Order Denying Temporary Injunction (May 12, 2015) (CR191) | App. 1 at *Page No.* |
| (2) | Letter Attached to Order Denying Temporary Injunction (May 13, 2015) (CR189-90) | App. 2 at *Page No.* |
| (3) | Temporary Sealing Order (May 12, 2015) (CR188) | App. 3 at *Page No.* |
| (4) | Mike Anthony's Nonqualified Stock Option Award Agreement (5RR, Ex. 3) | App. 4 at *Page No.* |
| (5) | Scott Hilburn's Nonqualified Stock Option Award Agreement (5RR, Ex. 7) | App. 5 at *Page No.* |
| (6) | Email from Mike Anthony to Chip Hornsby | App. 6 at *Page No.* |

with Signed Agreement (Dec. 19, 2012)
(5RR, Ex. 17)

(7)     Email from Scott Hilburn to Chip Hornsby          App. 7 at *Page No.*
with Signed Agreement (Dec. 18, 2012)
(5RR, Ex. 20)

(8)     Affidavit of Van Kelley (June 19, 2015)          App. 8 at *Page No.*
(Supp. CR 15-16)

**<u>Nature of the Case</u>**: This action arises out of Appellees Mike Anthony and Scott Hilburn's (collectively, "Former Managers") breach of the non-competition and non-solicitation provisions contained within Nonqualified Stock Option Award Agreements (the "Agreements"), which they executed in exchange for an award of stock options and in exchange for receiving confidential information from Appellant Patriot Supply Holdings, Inc. ("Patriot"). *See* App. 4; App. 5. Anthony and Hilburn were employed by Appellant Morrison Supply Company, LLC ("Morrison") as regional managers until April 13, 2015, when they (along with more than 40 other Morrison employees) resigned to work for a competitor, National Wholesale Supply, Inc. ("National"). *See* 2RR 22:24-25:11, 33:25-34:9; 4RR 41:18-19; 5RR, Exs. 1-2, 4, 6.

Following a three-day temporary injunction hearing, the trial court signed an Order Denying Morrison's Application for a Temporary Injunction, *see* App. 1, and attached a Letter to that Order, which explained its findings, *see* App. 2. In the Letter, the trial court stated that the Agreements were enforceable and that the non-competition and non-solicitation provisions were ancillary to those otherwise enforceable Agreements. *See* App. 2 at 1. The trial court also found that the geographic restrictions in the Agreements were overbroad, but refused to reform the Agreements "pending a final trial after appropriate discovery." *Id*. Despite

these findings, the Court refused to grant a temporary injunction because it found that Morrison and Patriot (collectively, "Morrison" unless a distinction is material) had an adequate remedy at law. *See* App. 1. Morrison now appeals from the trial court's denial of its Temporary Injunction Application.

**Trial Court**: Honorable Kerry L. Russell, 7th Judicial District Court, Smith County, Texas.

**Trial Court's Disposition**: Order Denying Temporary Injunction signed on May 12, 2015 (App. 1), which was accompanied by a Letter from Judge Russell explaining his reasoning (App. 2).

## STATEMENT REGARDING ORAL ARGUMENT

Morrison respectfully requests that this Court hold oral argument. Even though the controlling legal principles regarding when a temporary injunction is appropriate are well-settled, Morrison believes that oral argument will be useful for this Court to understand the Former Managers' actions fully. Morrison also believes that oral argument will be useful on the second issue raised in this appeal regarding the timing of reformation because that issue appears to be one of first impression in the Twelfth District Court of Appeals.

# ISSUES PRESENTED

1.    Did the trial court abuse its discretion by denying Morrison's Application for a Temporary Injunction when the evidence shows, without limitation, that:

      a.    the non-competition and non-solicitation provisions are ancillary to or part of otherwise enforceable Agreements;

      b.    the time and geographic restrictions sought in Morrison's Temporary Injunction Application are reasonable;

      c.    Anthony and Hilburn breached both the non-competition and non-solicitation provisions of the Agreements;

      d.    Morrison has suffered irreparable harm, and will continue to suffer irreparable harm, as a result of Anthony and Hilburn's actions; and

      e.    Morrison lacks an adequate remedy at law?

2.    After finding the Agreements to be "overbroad" as to geographic scope, did the trial court err by not reforming the Agreements at the temporary injunction stage—instead of "pending a final trial" after discovery—thereby preventing Morrison from recovering any damages accrued before the date of reformation under TEX. BUS. & COMM. CODE § 15.51(c)?

STATEMENT OF FACTS

Morrison Supply Company, LLC ("Morrison") is a wholesale distributor of construction materials and products. It is a wholly owned subsidiary of Patriot Supply Holdings, Inc. ("Patriot"),[1] which also owns several other wholesale distributors. *See* 3RR 107:14-20. Morrison operates in Texas and the southwest United States and has close to 1500 employees. *See* 3RR 128:18-129:2. Patriot has three "platform companies" in addition to Morrison that are based in California, Arizona, and Colorado. *See* 3RR 129:3-10.

## I. Anthony and Hilburn's Employment at Morrison.

Anthony and Hilburn worked for Morrison as co-Regional Managers of Morrison's East Texas Region. *See* 2RR 28:21-29:12. As Regional Managers, Anthony and Hilburn were responsible for branches in Kilgore, Tyler, Longview, Mt. Pleasant, Nacogdoches, Lufkin, and Texarkana, Texas as well as Shreveport, Louisiana. *See* 2RR 31:21-25. Anthony and Hilburn reported directly to Morrison's President. *See* 2RR 94:3-15.

During their employment at Morrison, Anthony and Hilburn were regularly provided with confidential information pertaining to Morrison's operations, including: (1) information regarding company and branch financial performance, (2) pricing strategy and data, (3) cost strategy and data, (4) customer evaluations,

---

[1] Throughout this brief, Morrison and Patriot are collectively referred to as Morrison, unless a distinction is material.

1

and (5) other strategic information. *See generally* 3RR 77:1-92:7. Some examples

of the confidential information provided to Anthony and Hilburn by Morrison are:

- Regular emails setting forth the price Morrison paid[2] for several key products where the email was password protected. *See* 4RR 10:3-14:23; *see also* 5RR, Ex. 22

- Morrison's pricing matrix which sets forth the individual prices for over 100,000 products and 15,000 customers, and the data underlying the matrix (which includes every sales transaction for the previous twelve months). *See* 3RR 72:21-75:23; *see also* 5RR, Ex. 8.

- Detailed reports showing Morrison's pricing strategy, including objectives for each region, ways to improve margins, and performance of each region; this document was labeled confidential and proprietary. *See* 3RR 87:24-92:7; *see also* 5RR, Ex. 12.

- Weekly dashboards for each branch under their supervision that contain all of the branch's financial transactions for the week as well as an analysis of the transactions, such as the "customer trends" section, which evaluates whether the branch is making money from a customer, whether the amount of money earned from that customer is increasing or

---

[2] Morrison was part of a buying group that negotiated many prices on a collective basis with the group members. However, Morrison also negotiated prices on an individual basis. As the employee responsible for these negotiations testified:

Q. Does Morrison always and only pay the price that's been negotiated by the buying group?
A. No, ma'am.
Q. And why is that?
A. Because of our volume, we go out and negotiate deals that are better than the buying group.
Q. And do you share those deals, the terms of those deals with other companies in the industry?
A. No, ma'am.
Q. Do you consider the terms of those deals to be confidential?
A. Yes, ma'am.
Q. And why is that?
A. Because it is an advantage for us as a company to have those programs.

4RR 9:6-23.

2

decreasing, how the goods are being priced, and similar information that is key to understanding whether the branch is profitable. *See* 3RR 77:1-81:24; *see also* 5RR, Ex. 9.

- Customer Evaluation reports that set forth detailed information regarding a particular customer including the customer's purchases, what the company's margin is on those purchases, and whether there are opportunities for additional sales or increased margin with this customer. *See* 3RR 82:2-85:21; *see also* 5RR, Ex. 10.

- "Daily Audit Summaries," which contain a list of every transaction in a particular branch and the details of those transactions including price, volume, and customer name. *See* 3RR 85:24-87:20; *see also* 5RR, Ex. 11.

- Information regarding pricing from Western Pottery, which is below market. *See* 4RR 15:2-16:17; *see also* 5RR, Ex. 23.

## II. Anthony and Hilburn Sign Nonqualified Stock Option Award Agreements in December 2012.

On or about December 13, 2012, Anthony and Hilburn met with Chip Hornsby, the CEO of Morrison, in Rockwall, Texas, to discuss the Company's decision to offer them stock options in Patriot, Morrison's parent company. *See* 2RR 65:24-67:18; 3RR 42:7-9. Anthony and Hilburn claim that, at this meeting, Hornsby handed them the Agreements, advised them that the non-competition provisions contained in the Agreements "w[ere] not worth the paper [they] w[ere] written on," and pressured them into signing the Agreements. *See* 2RR 68:5-71:13; 3RR 39:9-46:4.

There is no dispute that the Former Managers both signed the Agreements, but their accounts about when they signed the Agreements, what they were told about the Agreements, and whether they were pressured into signing the

3

Agreements are flatly contradicted by the record. Contrary to the Former Managers' accounts, although Hornsby met with Anthony and Hilburn on or about December 13, 2012, *see* 3RR 42:7-9, he ***did not provide*** them with the Agreements at that time and ***did not require*** them to sign the Agreements under allegedly pressured circumstances.

To the contrary, Hornsby emailed the Agreements to Anthony and Hilburn the morning after the meeting in Rockwall. 3RR 114:3-6; 5RR, Exs. 14 & 19. Hornsby asked Anthony and Hilburn to review the Agreements and call if they had questions. *See* 5RR, Exs. 14 & 19. Hornsby also requested, "if possible," that the Former Managers send him the signature pages during the following week. *See* 5RR, Exs. 14 & 19. He did so that he could get them to the attorney before the end of 2012. *See* 3RR 114:19-115:13. Hornsby never told the Former Managers that the Agreements were invalid, unenforceable, or "not worth the paper they were written on." 3RR 115:14-116:1. He did, however, tell them that signing the Agreements was voluntarily and not a mandatory condition of employment. 3RR 113:9-19.

The Former Managers' responses to these emails from Hornsby confirm Hornsby's account and the documentary evidence, and they further contradict the Former Managers' oral testimony:

- Anthony responded to Hornsby's email on December 14, 2012, noting that the attachment was blank. 5RR, Ex. 15. Nowhere in Anthony's

4

email to Hornsby did Anthony state that he had already signed the Agreement, as he testified. *Id.* Hornsby responded by resending a copy of the Agreement several hours later. *See* 5RR, Ex. 16. Five days later, on December 19, 2012, Anthony returned the executed signature page. *See* App. 6. If, as Anthony claims, he had signed the Agreement under supposedly pressured circumstances a week earlier, he failed mention that fact when he sent Hornsby the newly-signed document.

- Hilburn returned his executed Agreement to Hornsby on December 18, 2012, four days after receiving it. App. 7. In his email to Hornsby, Hilburn stated: "Once again i wont [*sic*] to thank you for this opportunity to be a part of our future growth." *Id.* Hilburn never indicated that he had already been provided—much less, signed—the Agreement, as one would expect if his version of the facts was true.[3]

## III. Relevant Terms of the Agreements.

The Agreements granted Anthony and Hilburn stock options in Patriot and provided that, consistent with their roles as Regional Managers, they "shall have access to and shall be provided with sensitive, confidential, proprietary and trade secret information of the Company and its Affiliates." App. 4 at 1, 4; App. 5 at 1, 4. In exchange for these benefits—benefits that have been extended to less than 2 percent of the Company's employees, *see* 3RR 111:4-13—the Agreements placed certain restrictive covenants on Anthony and Hilburn during their employment with Morrison and for one year following the termination of their employment. *See* App. 4 at 5; App. 5 at 5.

Specifically, Anthony and Hilburn agreed to the following provisions:

---

[3] Hilburn's testimony about signing the Agreement at the meeting in Rockwall also is contradicted by the fact that he dated his signature page "12/18/12." App. 7.

5

8. Non-Competition. In consideration of the Option granted to the Participant hereunder, the Participant acknowledges that in the course of Participant's employment with the Company or its Affiliates the Participant has become and shall become familiar with trade secrets and other Confidential Information concerning the Company and their Affiliates and that the Participant's services have been and shall be of special, unique and extraordinary value to the Company and its Affiliates. Therefore, the Participant agrees that, during the period of Participant's employment with the Company or its Affiliates and for one (1) year thereafter (the "**Restrictive Period**"), the Participant shall not engage, directly or indirectly in the Business anywhere in the United States or, without the prior written consent of the Board, directly or indirectly, own an interest in, manage, operate, join, control, lend money or render financial or other assistance to or participate in or be connected with, as an officer, employee, partner, stockholder, consultant, or otherwise, any Person that competes with the Business . . . .The Participant expressly agrees and acknowledges that the restrictions contained in this Section 8 do not preclude the Participant from earning a livelihood, nor do they unreasonably impose limitations on the Participant's ability to earn a living. In addition, the Participant agrees and acknowledges that the potential harm to the Company and its Affiliates of their non-enforcement outweighs any harm to the Participant of its enforcement by injunction or otherwise. The Participant expressly acknowledges and agrees that each and every restraint imposed by this Agreement is reasonable with respect to the subject matter, time period and geographical area. The Restrictive Period shall be extended by the length of any period during with [sic] the Participant is in breach of the terms of this Section 8 or Section 9.[4]

9. Non-Solicitation. The Participant agrees that, during the Restrictive Period, the Participant shall not (a) induce or attempt to induce any customer, supplier or other party with whom the Company or any Affiliate do business to cease doing business with the Company or such Affiliates, or in any way interfere with or attempt to interfere with the relationship between the Company and its Affiliates and any existing customer, supplier or other party with whom the Company or its Affiliates do business or (b) hire, employ or in any

---

[4] App. 4 at 5; App. 5 at 5.

way, directly or indirectly, interfere with or attempt to interfere with any officers, employees, representatives or agents of the Company and its Affiliates, or induce or attempt to induce any of them to leave the employ of the Company or its Affiliates, as applicable, or violate the terms of their contracts, or any employment arrangements, with the Company or its Affiliates; provided, that while the foregoing shall not prohibit a general solicitation to the public by general advertising, hiring any person identified in this Section 9 as a result of such general solicitation is prohibited during the Restrictive Period.[5]

Further, in light of the fact that the Agreements provided that Anthony and Hilburn "shall have access to and shall be provided" Morrison's confidential and proprietary information, the Former Managers agreed that they "shall not (during the period of employment and at all times thereafter) disclose to any unauthorized person or use for Participant's own purposes any such Confidential Information without the prior written consent of the Company" except in circumstances not relevant here. App. 4 at 4; App. 5 at 4.

**IV.    Anthony and Hilburn Breach the Non-Competition and Non-Solicitation Provisions in the Agreements.**

While employed at Morrison, and several months before his resignation in April 2015, Anthony began speaking with Charlie Reynolds, the President of National Wholesale Supply, Inc. ("National"), about Anthony coming to work for National. *See* 2RR 25:25-26:24 (testifying that, in early 2015, Anthony

---

[5] App. 4 at 5; App. 5 at 5. "Business" is defined in the Agreements as "the business of the Company and its Subsidiaries as currently conducted on the date hereof, as conducted within the five (5) years prior to the date hereof, or which the Board has authorized the Company to develop or pursue (by acquisition or otherwise)." App. 4 at 7; App. 5 at 7.

7

"approached National and expressed some interest in coming to work for the company"). National is a wholesale distributor, is in the same business as Morrison, and is a competitor of Morrison. *See* 2RR 12:14-22. Anthony also spoke with numerous of Morrison's other employees about going to work for National. *See* 2RR 28:1-7. In fact, Anthony conducted several meetings with Reynolds and Morrison employees at which they discussed employment at National. *See* 2RR 28:10-23.

These discussions culminated in the mass resignations of Anthony, Hilburn, and approximately 40 additional employees from Morrison's East Texas region on April 13, 2015. *See* 2RR 25:9-11, 33:25-34:9; 5RR, Ex. 4; 5RR, Ex. 6. Before April 13, 2015, National did not have any operations in East Texas. *See* 2RR 32:1-4. On April 13, 2015, however, National opened up new branches in Kilgore, Tyler, Longview, Mt. Pleasant, and Shreveport. *See* 2RR 32:5-33:8; *see also* 5RR, Ex. 2. All of these newly opened branches were staffed with former Morrison employees, including Anthony and Hilburn. *See* 2RR 33:25-34:9.

National announced these operational changes on its website. *See* 5RR, Ex. 2. All of the new branches were listed along with their branch managers, which, for Kilgore, was Mike Anthony and, for Tyler, was Scott Hilburn. *Id.*

Anthony confirmed his employment with National in a conversation with David Cunningham, the CEO of H.M. Cunningham Companies, a company that

8

represents manufacturers in marketing their products to wholesale suppliers. *See* 2RR 12:1-10. Cunningham, who works with both Morrison and National, *see* 2RR 12:14-18, had heard that a number of Morrison employees had left to work for National and called Anthony to understand how these events transpired, *see* 2RR 15:2-12. During that conversation, Anthony confirmed that he was going to work for National, and told Cunningham that "he was going to be the regional manager." 2RR 15:13-19. Relying on Anthony's representations about his employment with National, Cunningham circulated an "email blast" to his clients announcing the organizational changes in East Texas. *See* 2RR 13:19-24. That email lists National's new East Texas locations and identifies Mike Anthony as National's manager in the region. *See* 5RR, Ex. 1.

Within three days of the Former Managers' resignation (and the mass exodus from Morrison), Morrison sought and obtained a temporary restraining order ("TRO"), which temporarily prevented Anthony and Hilburn from being employed at National. CR31-72; CR227-28. The TRO was in effect during the temporary injunction hearing. *See* 4RR 104:2-12 (extending the TRO). Thus, although the Former Managers testified at the temporary injunction hearing that

9

they were not employed by National, *see* 2RR 25:12-14; 3RR 7:8-15, that fact is irrelevant because the Former Managers were subject to the TRO at that time.[6]

Moreover, Anthony and Hilburn clearly stated their intentions to work for National as soon as possible and certainly during the one-year time restriction specified in the Agreements. *See* 2RR 25:19-21; 3RR 19:2-5 ("Q. [Y]ou would be employed with . . . National Wholesale . . . right this minute if it weren't for this legal proceeding, correct? A. Correct."). And that is exactly what Anthony and Hilburn did. They have—since the time of the temporary injunction hearing and the lapse of the TRO—followed through on their stated intentions and now work for National. *See* App. 8. Thus, Anthony and Hilburn now are employed by National, a company that directly competes with Morrison in the same geographic location where Anthony and Hilburn worked for Morrison.

## V. The Proceedings Below.

On April 13, 2015, the same day as the exodus of employees from Morrison to National, the Former Managers filed an Original Petition for a declaratory judgment that the Agreements were unenforceable. *See* CR1-30. Morrison responded a few days later by asserting breach of contract and breach of fiduciary duty counterclaims against the Former Managers and by seeking a TRO and other

---

[6] Further, any self-serving suggestion by the Former Managers at the temporary injunction hearing that that they never worked for National is belied by the weight of evidence presented. *See* 5RR, Exs. 1-2; 2RR 13:13-24.

injunctive relief. *See* CR31-72. On April 16, 2015, after hearing argument from both parties, the trial court issued a TRO. *See* CR227-28.

Between April 27 and April 30, 2015, the Court conducted a three-day hearing on Morrison's Application for a Temporary Injunction. *See* CR228-29. On the first day of that hearing, Morrison submitted a Motion for a Temporary Sealing Order given that certain of Morrison's confidential and proprietary information would be discussed and examined during the hearing. *See* CR142-45. After the three-day hearing concluded, the trial court took Morrison's Application for a Temporary Injunction and its Motion for a Temporary Sealing Order under advisement and requested further briefing on a few issues. *See* CR229; CR149-73.

On May 12, 2015, the trial court signed an Order Denying Morrison's Temporary Injunction Application based on its finding that Morrison had an adequate remedy at law. *See* App. 1. The Court also attached a Letter to the Order Denying Morrison's Temporary Injunction Application, which further explained certain additional findings, including that: (1) the Agreements were not illusory and (2) the relevant non-competition and non-solicitation provisions were ancillary to the otherwise enforceable Agreements.[7] App. 2 at 1. While the trial court also found that the geographic restriction in the Agreements was overbroad, it refused

---

[7] While the trial court's May 13, 2015 Letter is not a formal order, *see Goff v. Tuchscherer*, 627 S.W.2d 397, 389-99 (Tex. 1982) (per curiam), and is not necessarily entitled to the same weight a formal order, Morrison cites to that letter because it provides further explanation as to why the trial court denied Morrison's Temporary Injunction Application. *See* App. 2.

11

to reform the Agreements, stating that those Agreements should be reformed "pending a final trial after appropriate discovery." *Id.*

Also on May 12, 2015, the trial court granted Morrison's Motion for a Temporary Sealing Order, finding that six of the exhibits admitted and discussed at the temporary injunction hearing contained Morrison's "confidential and proprietary information." App. 3.

On May 22, 2015, Morrison filed a Motion for Reconsideration, which requested that the trial court reconsider its denial of Morrison's Temporary Injunction Application and, at the very least, that it reform the Agreements so that Morrison would not be prevented from obtaining damages caused by the Former Managers' ongoing breaches of the Agreements. CR192-97. Morrison supplemented that Motion on June 22, 2015. Supp. CR17-19. The trial court has not ruled on that Motion. Morrison has requested an early trial setting in September 2015, but the trial court has yet to issue a scheduling order or set the matter for trial.

On May 29, 2015, Morrison filed its timely joint notice of accelerated interlocutory appeal. *See* CR205-09.

## SUMMARY OF THE ARGUMENT

The trial court made two fundamental errors in denying Morrison's Temporary Injunction Application. *First*, the trial court found that Morrison had

an adequate remedy at law. But ample evidence presented at the temporary injunction hearing contradicts this finding and demonstrates that Morrison's injuries cannot be satisfied by damages alone. The evidence presented also confirmed, as the trial court correctly found, that the Agreements were enforceable and that Morrison showed a probable right of recovery. The trial court's misapplication of law to the facts presented at the hearing constitutes error and an abuse of discretion.

*Second*, the trial court further erred by refusing to reform the geographic restriction in the Agreements even though (1) it found that provision to be overbroad, *see* App. 2 at 1, and (2) Morrison had requested that the Court reform the Agreements, *see, e.g.*, CR44. Section 15.51(c) of the Texas Business and Commerce Code does not allow Morrison to recover damages for breaches of the Agreement prior to the date of reformation. Thus, the trial court's refusal to reform the Agreements at the temporary injunction stage puts Morrison in a "Catch-22": Morrison not only lacks the protection of injunctive relief, but it also cannot recover any damages based on breaches that occur going forward until the Agreements ultimately are reformed "pending a final trial." App. 2 at 1. This fact further undercuts the trial court's erroneous finding that Morrison has an adequate remedy at law.

For these reasons and as explained below, this Court should reverse the trial court's Order Denying Morrison's Temporary Injunction Application and remand the action for the trial court to issue a temporary injunction. Moreover, regardless of this Court's decision on the first issue presented in this appeal, it should reverse and remand the action with instructions that the trial court reform the Agreements so that Morrison is not prevented from recovering additional damages caused by further breaches of the Agreements.

## STANDARDS OF REVIEW

An order denying a temporary injunction is an appealable interlocutory order. TEX. CIV. PRAC. & REM. CODE § 51.014(a)(4); *see In re Tex. Nat'l Res. Conservation Comm'n*, 85 S.W.3d 201, 205 (Tex. 2002). The issue presented to a trial court at a temporary injunction hearing is whether the applicant may preserve the status quo pending a trial on the merits. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).

On appeal, a trial court's order granting or denying a temporary injunction is reviewed for abuse of discretion. *See Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978). While this means that the evidence is reviewed in the light most favorable to the trial court's ruling, *see id.*, a trial court's discretion does not extend to the erroneous application of the law to established facts, *see INEOS Grp. Ltd. v. Chevron Phillips Chem. Co.*, 312 S.W.3d 843, 848 (Tex. App.—Houston [1st

14

Dist.] 2009, no pet.) ("A trial court abuses its discretion in granting or denying a temporary injunction when it misapplies the law to the established facts.").

The trial court's refusal to reform the Agreements at this stage of the proceedings—and after it found that they included overbroad geographic restrictions—is a legal conclusion that is reviewed *de novo*. *See In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding) (a trial court's legal determinations are reviewed *de novo*).

## ARGUMENT

### I. The Trial Court Abused Its Discretion by Denying Morrison's Application for a Temporary Injunction.

Under Texas law, in order to obtain a temporary injunction, Morrison only was required to show that it: (1) pleaded for permanent injunctive relief against the Former Managers; (2) has a probable right to the relief sought; and (3) has a probable, imminent, and irreparable injury in the interim for which there is no adequate remedy at law. *See Butnaru*, 84 S.W.3d at 204.

As an initial matter, there is no dispute that Morrison has pleaded a cause of action for a permanent injunction consistent with the TRO that the trial court granted. *See* CR42-44; CR228. Accordingly, this Court need only consider whether Morrison showed (1) a probable right to the relief sought and (2) a probable, imminent, and irreparable injury. Morrison presented ample evidence on both issues at the temporary injunction hearing, and thus this Court should reverse

the trial court's denial of Morrison's Temporary Injunction Application and remand the action for the trial court to issue a temporary injunction.

## A. The Evidence Shows that Morrison Has a Probable Right to the Relief Requested.

"A probable right of recovery is shown by alleging a cause of action and presenting evidence tending to sustain it." *Argyle Indep. Sch. Dist. ex rel. Bd. of Trustees v. Wolf*, 234 S.W.3d 229, 236 (Tex. App.—Fort Worth 2007, no pet.); *see also DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 686 (Tex. 1990) ("An injunction plaintiff need not establish the correctness of his claim to obtain temporary relief, but must show only a likelihood of success on the merits.").

Morrison met this burden and showed probable success on its breach of contract counterclaim against the Former Managers. *See* CR38-39 (Morrison's counterclaims). Under Texas law,[8] non-competition, non-solicitation, and similar provisions will be enforced so long as they (1) are ancillary to or part of an otherwise enforceable agreement, and (2) contain reasonable limitations as to the time, geographic area, and scope of activities to be restrained that are reasonable and not greater than necessary to protect the employer's legitimate interests. TEX. BUS. & COMM. CODE § 15.50 *et seq.* Morrison's requested enforcement of these Agreements satisfies these standards.

---

[8] Although Section 19 of the Agreements provides that they shall be governed by and construed in accordance with the laws of the State of Delaware, *see* App. 4 at 7-8; App. 5 at 7-8, neither party sought to apply Delaware law, and the parties tried the matter under Texas law.

16

1.     <u>The Non-Competition and Non-Solicitation Provisions Are "Ancillary to or Part of an Otherwise Enforceable Agreement."</u>

In the Letter that accompanied the Order Denying Morrison's Temporary Injunction Application, the trial court specifically found that the non-competition and non-solicitation provisions in the Agreements were "ancillary to an otherwise enforceable agreement." App. 2 at 1. The trial court's finding in this regard was correct and supported by ample evidence from the temporary injunction hearing—namely, the fact that, in exchange for executing the Agreements, the Former Managers received (1) confidential information during the course of their employment, and (2) stock option awards.

First, "[a]n employer's promise to provide an employee with confidential information and an employee's reciprocal promise not to disclose such confidential information "meet[s] the requirement that the covenant be designed to enforce the employee's consideration provided in the agreement." *Alex Sheshunoff Mgmt. Servs., LP. v. Johnson*, 209 S.W.3d 644, 649 (Tex. 2006) (finding an employer's non-competition agreement was enforceable because the employer had provided confidential information to the employee as promised in the parties' employment agreement). That standard is satisfied here.

The Agreements provide that the Former Managers "***shall*** have access to and ***shall*** be provided with sensitive, confidential, and proprietary and trade secret information" and that, in exchange for that benefit, the Former Managers agree not

17

to "disclose to any unauthorized person . . . any such Confidential Information without the prior written consent of the Company." *E.g.*, App. 5 at 4 (emphasis added). The evidence below established that Anthony and Hilburn received confidential information. *See, e.g.*, 3RR 77:1-81:24 (discussing Exhibit 9, which was a branch manager dashboard, showing "data and information" that the company considered confidential); 3RR 82:3-85:21 (discussing Exhibit 10 showing Morrison's pricing strategy which was not shared with competitors); *see also supra* Facts Section I. In fact, six of Morrison's trial exhibits (which Former Managers received during their employment with Morrison) were sealed pursuant the trial court's Temporary Sealing Order because they "contain[ed] [Morrison's] confidential and proprietary information." App. 3 (Order sealing Exhibits 9-12 and 22-23). This evidence demonstrates that the Former Managers received confidential information in exchange for a promise not to disclose such information. This fact alone is a sufficient basis for the trial court's finding that the relevant non-competition and non-solicitation provisions are ancillary to otherwise enforceable Agreements. *See Alex Sheshunoff Mgmt. Servs., LP.*, 209 S.W.3d at 649.

Second, an additional, independent basis for the trial court's finding is the fact that an award of stock options constitutes valid consideration for a non-competition agreement. *See Marsh USA, Inc. v. Cook*, 354 S.W.3d 764 (Tex.

18

2011). In *Marsh*, the Texas Supreme Court held that the grant of stock options to an employee was "reasonably related" to the employer's interest in protecting its goodwill and, accordingly, the non-competition provision was enforceable. *Id.* at 777. Importantly, the *Marsh* Court held that it was the grant or award of stock options—not the exercise of those options—that made the non-competition agreement enforceable. *See id.* ("**By awarding Cook stock options**, Marsh linked the interests of a key employee with the company's long-term business interests.") (emphasis added).

Like the employee in *Marsh*, the Former Managers were granted stock options that vested over time and were designed to align their interests with Morrison's in increasing the value of the Company. *See* 2RR 45:18-21 (Anthony testifying that he was told that the purpose of the Agreements was to give employees a "reward or give us stock options in the company" and that "the better the company did—if the company did well, we would make money"); *see also* 3RR 109:10-14 ("The individuals that participate [in the stock option award program] have the opportunity, again, to have a small degree of ownership, as far as in the business, as far as an option holder with the ability" to obtain proceeds.). Hilburn recognized this fact, thanking Hornsby for "this opportunity to be a part of our future growth." App. 7.

19

Moreover, as in *Marsh*, the evidence presented at the temporary injunction hearing demonstrated that these stock options had value. *See* 3RR 132:14-133:3 (noting that the price of Patriot's stock increased after the Former Managers options were granted); 3RR 110:10-16 (if the Former Managers exercised their stock options, they would benefit by "get[ting] the difference between the value of the strike price that they got several years prior, and the value of the shares when they're sold").

In sum, the trial court's finding that the non-competition and non-solicitation provisions were "ancillary" to otherwise enforceable Agreements was correct because Morrison provided Anthony and Hilburn with the promised confidential information and with valuable stock options.

### 2. The Time and Geographic Scope Restrictions Sought in the Temporary Injunction Are Reasonable.

There was no dispute at the temporary injunction hearing that the one-year time restriction in the Agreements was reasonable. And for good reason. Several Texas courts have concluded that a one-year time limitation in a non-competition agreement is reasonable. *See, e.g.*, *Salas v. Chris Christensen Sys.*, No. 10-11-00107-CV, 2011 Tex. App. LEXIS 7530, at *55 (Tex. App.—Waco Sept. 14, 2011, no pet.); *Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 655 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *Elec. Data Sys. Corp. v. Powell*, 508 S.W.2d 137, 139 (Tex. Civ. App.—Dallas 1974, writ ref'd n.r.e.).

20

The Former Managers, however, did take issue with the nationwide scope of the geographic restriction. *See* 4RR 86:15-87:4 (arguing about alleged geographic overreach). But whether or not the geographic restriction is overbroad in the abstract is not relevant here because Morrison only sought to enforce the non-competition and non-solicitation obligations of the Agreement where Anthony and Hilburn worked and had responsibility during their employment with Morrison. *See* 4RR 73:15-24 ("But we have never sought to enforce [the non-competition provision] on a national basis. So we don't believe that's an issue the Court needs to address. . . . [W]e are seeking a very specific injunction. . . . It would be limited to the specific region in which Mr. Anthony and Mr. Hilburn work."). In other words, regardless of the geographic restrictions set forth in the Agreements, the geographic restrictions sought in Morrison's Temporary Injunction Application were reasonable. *See, e.g.*, *Stone v. Griffin Commc'ns & Sec. Sys., Inc.*, 53 S.W.3d 687, 694 (Tex. App.—Tyler 2001, no pet.) (enforcing five-year covenant against former employees selling security systems in specified counties in East Texas where they had worked during their prior employment); *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 794 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (enforcing two-year covenant barring manager from competing with former employer in a two-county area where most of his customers were located); *Curtis v. Ziff Energy Grp., Ltd.*, 12 S.W.3d 114, 119 (Tex. App.—Houston [14th Dist.]

1999, no pet.) (geographic restrictions in non-competition agreements are reasonable if they are commensurate with the territory where employee worked).

Importantly, courts have granted temporary injunctions even where they found that certain restrictions in relevant non-competition agreements were overbroad. *See, e.g.*, *TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 756 (S.D. Tex. 2009) (entering a limited injunction that was not overbroad despite an overbroad geographic restriction in the relevant agreement itself); *Tranter, Inc. v. Liss*, No. 02-13-00167-CV, 2014 WL 1257278, at *7 (Tex. App.— Fort Worth Mar. 27, 2014, no pet.) ("[I]f the limitations as to time and scope of activity were likewise unreasonable, the trial court could reform the limitations and enforce the reformed covenant through injunctive relief.").[9] Put another way, any overbreadth in the Agreements' restrictions does not bar injunctive relief.[10]

Finally, the evidence presented at the temporary injunction hearing confirms that the geographic restrictions sought by Morrison in its Temporary Injunction Application, which only covered certain East Texas counties and Caddo Parish,

---

[9] Importantly, in *Liss*, the court found that the trial court abused its discretion by denying a temporary injunction even though the appellant had not shown a probable right to recovery on all of its claims. *See* 2014 WL 1257278 at *5-7. The fact that the appellant had shown a probable right to recovery on its permanent injunction claim was sufficient. Morrison has shown a probable right to recovery on its permanent injunction claim as well as its other claims.

[10] Moreover, the Agreements themselves specifically provide that "[i]f . . . a court or an arbitrator shall hold that the duration, scope or area restrictions stated therein are unreasonable . . . the parties agree that the maximum duration, scope or area reasonable . . . **shall be substituted**." App. 4 at 6 (emphasis added); *see also* App. 5 at 6 (same).

22

Louisiana, *see* CR39-44, were reasonable because Anthony and Hilburn were employed at Morrison as co-Regional Managers over the same geographic area. *See* 2RR 29:2-4; 3RR 15:4-12. And far from being overbroad, the geographic restrictions sought in the Temporary Injunction Application align with the Former Managers' new jobs at National. *See* 5RR, Ex. 2 (April 13, 2015 screenshot of National's website, which listed Hilburn as the manager for its Tyler office and Anthony as the manager for its Kilgore office); *see* 5RR, Ex. 1 (email blast from H.M. Cunningham Companies listing Anthony as the Regional Manager for National's East Texas branches); *see also* App. 8 (confirming that Anthony and Hilburn currently are working at National's Kilgore and Tyler branches, respectively). Because Morrison is not seeking to enforce the nationwide geographic restrictions in the Agreements, that fact cannot justify the trial court's denial of Morrison's Temporary Injunction Application.

3. Anthony and Hilburn Breached Their Non-Solicitation and Non-Competition Obligations.

In exchange for receiving stock options and access to confidential information, the Former Managers agreed to refrain (1) from hiring or inducing any of Morrison's employees to leave their employment with Morrison, and (2) from competing with Morrison for a period of one-year. *See* App. 4 at 5; App. 5 at 7 at 5. Anthony and Hilburn breached those provisions. Over a period of several months before April 13, 2015, the Former Managers participated in and facilitated

23

National's employment of dozens of Morrison's employees. And since April 13, 2015, the Former Managers have worked for National.

### a.     Anthony and Hilburn Breached Their Non-Solicitation Obligations.

Although the Former Managers "testified that they did not solicit any of the Morrison employees," App. 2 at 2, that claim is contradicted by Anthony and Hilburn's repeated admissions that they worked with National to staff (with Morrison employees) National's new East Texas operations.

First, during their employment at Morrison and several months before resigning in April 2015, Anthony and Hilburn "approached" or "reached out to" the President of National (Charlie Reynolds) to speak with him about coming to work for National. *See* 2RR 25:25-26:24; 3RR 16:10-25. Anthony and Hilburn also spoke with numerous other Morrison employees about going to work for National, thus violating the non-solicitation provisions in the Agreements. *See* 2RR 28:1-7; *see also* 3RR 17:21-18:6. In fact, Anthony and Hilburn conducted several meetings with Reynolds and Morrison employees at which they discussed employment at National. *See* 2RR 28:10-23; 3RR 21:8-17 (Hilburn admitting that he met with Reynolds and other Morrison employees). As noted, these discussions, which Anthony and Hilburn helped orchestrate, resulted in the mass resignations of approximately 40 employees from Morrison's East Texas region on April 13, 2015. *See* 2RR 25:9-11, 33:25-34:9; 5RR, Ex. 4; 5RR, Ex. 6. These

24

actions by Anthony and Hilburn breached the non-solicitation provisions in the Agreements they signed.

Second (and in addition to the breaches identified above), Hilburn specifically testified that he helped his brother resign from Morrison by requesting that Anthony send him a resignation form for his brother to use to "turn in his resignation." 3RR 23:20-25:10; *see also* 5RR, Ex. 5 (blank resignation form). Hilburn received the blank form and gave it to his brother. *See* 3RR 23:20-25:10. Moreover, at least 28 other Morrison employees used the same resignation form, *see* 5RR, Ex. 6; *see also* 3RR 26:2-27:8, and Hilburn submitted those signed resignation forms to Morrison's CEO, *see* 5RR, Ex. 6. This conduct constitutes a breach of the non-solicitation provisions in the Agreements. *See* App. 5 at 5 (agreeing not to "interfere with or attempt to interfere with any . . . employees . . . of the Company . . . or induce or attempt to induce any of them to leave the employ of the Company"); App. 4 at 5 (same).

### b. *Anthony and Hilburn Breached Their Non-Competition Obligations.*

In addition to breaching the non-solicitation provisions in their Agreements, the Former Managers breached and continue to breach the non-competition provisions. The Former Managers went to work for National immediately upon resigning from Morrison. *See* 2RR 15:13-22; *see* 2RR 22:24-23:2 ("Q. . . . [W]ho told you [on April 13, 2015] that Mike Anthony was region manager for National

25

Wholesale Supply . . . ? A. Mike Anthony."); 5RR, Ex. 2 (screenshot of National's website on April 13, 2015, showing Anthony as the Kilgore branch managers and Hilburn as the Tyler branch manager). The Former Managers may have resigned from National (or otherwise stopped working) after the TRO was granted and while it was in effect at the temporary injunction hearing, but they have since returned to work at National—where they remain today. *See* App. 8.

For these reasons, Morrison has shown a probable right to the relief requested because (1) the non-competition and non-solicitation provisions are ancillary to otherwise enforceable Agreements, (2) the time and geographic restrictions sought in the Temporary Injunction Application are reasonable, and (3) the Former Managers have breached their obligations under the Agreements.

### 4. The Former Managers' Arguments that Morrison Failed to Show an Enforceable Agreement Fail.

During the temporary injunction hearing, the Former Managers raised four arguments in an effort to undermine the enforceability of the Agreements. Specifically, they argued that (1) the Agreements are not supported by consideration; (2) the Agreements were signed under duress; (3) they were "fraudulently induced" into signing the Agreements; and (4) the Agreements are unconscionable. The trial court rejected these arguments and found that the Agreements were enforceable. *See* App. 2. This Court should reach that same conclusion.

26

### a. *The Agreements Are Supported by Consideration.*

The Former Managers first complained that the Agreements are not supported by consideration. As noted, however, the Agreements were supported by two types of consideration: (1) stock option awards and (2) promises to provide confidential information, which ultimately was provided. *See supra* Section I.A.1. The Former Managers' claims that the Agreements lacked consideration because the promises therein were illusory fail.

First, the Former Managers argued that the stock options awards were illusory because they claim that, under the Patriot "Stock Award Agreement," Patriot can alter or amend the Agreements at any time and without their consent. *See* 4RR 83:24-84:5. But the "Stock Award Agreement" specifically includes the protection that "no action by the Committee shall adversely affect in any material respect the rights granted to any Participant under any outstanding Awards." 5RR, Ex. 13 at 9. In light of this language, which allows Patriot to make changes that are **prospective only**, the Former Managers' assertions that the Agreements are illusory fail under well-established Texas law. *See In re Halliburton Co*., 80 S.W.3d 566, 569-70 (Tex. 2002) (holding that a contract is enforceable even when one party has the right to amend or terminate it unilaterally, so long as the right is restricted in some manner, and enforcing an arbitration plan that could be terminated at any time but that "termination shall not be effective until 10 days

27

after reasonable notice of termination is given to Employees or as to Disputes which arose prior to the date of termination"); *In re Odyssey Healthcare, Inc.*, 310 S.W.3d 419, 422 (Tex. 2010) (holding that an "Occupational Injury Benefit Plan" was enforceable even though it could be unilaterally amended and terminated because it also provided that such changes would not be effective as to injuries that occurred before the change).

Second, the fact that the Former Managers received confidential information after signing the Agreements is an independent basis for concluding that the Agreements were supported by consideration. As the Texas Supreme Court held in *Alex Sheshunoff Mgmt. Servs., LP.*, when an otherwise illusory contract includes a promise that the employee will be provided with confidential information—and confidential information is provided after the non-competition agreement is signed—that otherwise illusory contract becomes enforceable by performance. *See* 209 S.W.3d at 649-51. That is exactly what happened here. Morrison agreed to provide Anthony and Morrison with confidential information in exchange for entering into the Agreements, and because Morrison provided the Former Managers with this type of information after the Agreements were signed, *see supra* Facts Section I (outlining examples of confidential information received by Anthony and Hilburn); *see also* App. 3 (Order temporarily sealing six of

28

Morrison's exhibits because they contained proprietary information), the Agreements became enforceable by performance.

This conclusion is not undermined by the Former Managers' claim that *some* of the confidential information they received had a "short shelf life," *see* 4RR 78:8-15, because *most* of the confidential information that the Former Managers received did not have a "short shelf life." To the contrary, confidential information that the Former Managers received was used to develop strategies that Morrison continues to use today. *See* 3RR 96:24-97:4 (stating that certain confidential pricing information received by the Former Managers is used to analyze Morrison's overall margins and that it would be included in a data set for a 12-month "look back"); 4RR 102:7-103:1 (noting that pricing strategy, which Morrison continues to use, is not "stale" confidential information).

In sum, the stock options awards and the confidential information that the Former Managers received demonstrate that the Agreements were supported by consideration.

### b.     *The Agreements Were Not Signed Under Duress.*

The Former Managers also argued that the Agreements cannot be enforced because they were signed under duress. *See* CR4. But there was no evidence of duress presented at the temporary injunction hearing. *See* 4RR 61:23-25 (noting lack of evidence); *see also supra* Facts Section II. And, in any event, the Former

Managers cannot meet the extremely high standard to show duress required by Texas law. *See, e.g.*, *Wright v. Sydow*, 173 S.W.3d 534, 544 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (noting that duress requires "(1) a threat to do something a party has no legal right to do, (2) an illegal exaction or some fraud or deception, and (3) an imminent restraint that destroys the victim's free agency and leaves him without a present means of protection").

### c.   There Was No Fraudulent Inducement.

The Former Managers' "fraudulent inducement" argument fares no better. As an initial matter, although Anthony and Hilburn testified that Hornsby made various representations about the Agreements that were not true, *see, e.g.*, 3RR 47:21-48:2 (Hilburn stating that Hornsby told him that the non-competition provisions lasted for one-year from the date the agreement was signed), the evidence presented at the temporary injunction hearing demonstrated that the Former Managers' testimony regarding the circumstances of execution was false, *see supra* Facts Section II; *see also* 3RR 112:17-113:8 (Hornsby testifying that he told the Former Managers that the non-competition provisions ran for one year from the date of their departure from Morrison).

Moreover, even assuming the accuracy of Anthony and Hilburn's testimony, Texas law is clear that one must actually "and *justifiably*" rely on a representation to plead "fraudulent inducement." *DRC Parts & Accessories, L.L.C. v. VM*

30

*Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (emphasis added). Any reliance by Hilburn or Anthony on Hornsby's purported representations was not justified here because those purported representations are contradicted by the plain language of the Agreements. *E.g.*, App. 4 at 5 (the Restrictive Period runs "during the period of Participant's employment with the Company . . . and for one (1) year thereafter"). Because the Former Managers' supposed "reliance upon an oral representation . . . is directly contradicted by the express, unambiguous terms of [the Agreements]," their fraudulent inducement argument fails as a matter of law. *DRC Parts*, 112 S.W.3d at 858; *see also id.* at 858 n.3 (collecting cases).

### d.      *The Agreements Are Not Unconscionable.*

The Former Managers two "unconscionability" arguments are contradicted by the record and by established Texas law.

*First*, the Former Managers asserted that the Agreements were unconscionable because they were "rushed" into signing them.[11]  *See* 4RR 81:13-23. This argument is based, in large part, on the assertion that the Former Managers were forced to sign the Agreements on the same day they first discussed

---

[11] Any "rushed" sense that the Former Managers felt was designed to benefit them.  As Hornsby confirmed, he encouraged the Former Managers to sign the Agreements by the end of the following week so that they could take advantage of an increase in the share price caused by the re-valuation of shares during the first quarter of 2013.  *See* 3RR 114:19-115:13.  This consideration contradicts any suggestion of unconscionability.

31

them with Hornsby: December 13, 2012. *See* 2RR 47:6-48:19. But, as explained above, *see supra* Facts Section II, that argument repeatedly was contradicted by (1) Hornsby's testimony, *see* 3RR 114:3-18 (stating that the Former Managers did not sign the document on December 13, 2012, but that he emailed the Agreements to them to sign the following morning), and (2) emails confirming Hornsby's testimony, *compare* 5RR, Ex. 16 (12/14/12 email from Hornsby to Anthony resending Agreement to sign after earlier email attachment error), *with* App. 6 (12/19/12 email from Anthony to Hornsby attaching signed Agreement signature page); *compare* 5RR, Ex. 18 (12/14/12 email from Hornsby to Hilburn attaching Agreement to sign), *with* App. 7 (12/18/12 email from Hilburn to Hornsby attaching signed Agreement signature page dated 12/18/12).[12]

*Second*, the Former Managers complained about the Agreements' forum selection clauses, which select Delaware as the exclusive forum—except for actions involving injunctive relief. *See* 4RR 84:15-85:4; *see also* App. 4 at 6, 8; App. 5 at 6, 8. But forum selection clauses are not unconscionable, and Texas law instructs courts to enforce them as reasonable. *See, e.g.*, *Rouse v. Tex. Capital Bank, N.A.*, 394 S.W.3d 1, 5 (Tex. App.—Dallas 2011, no pet.) ("[B]y entering into an agreement having a forum selection clause, the parties effectively

---

[12] The Former Managers also had the opportunity to consult with an attorney or a financial advisor before signing the Agreements. *See* 3RR 113:20-114:2. Their decision not to take advantage of that opportunity does not make the Agreements unconscionable.

represented to each other that the agreed forum is not so inconvenient that enforcing the clause will deprive either party of its day in court, whether for cost or other reasons."); *see also In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009) (orig. proceeding) (rejecting the argument that forum selection clauses are against public policy because there is no statute "requir[ing] [this] suit to be brought or maintained in Texas").

In sum, Morrison showed that it has a probable right to the relief requested, and all of the arguments raised by the Former Managers fail. The trial court's finding that the non-competition and non-solicitation provisions "are ancillary to . . . otherwise enforceable agreement[s]" was correct. App. 2 at 1.

> **B. The Evidence Shows that Morrison Has a Probable, Imminent, and Irreparable Injury for Which There Is No Adequate Remedy at Law; the Trial Court Erred and Abused Its Discretion in Holding Otherwise.**

"An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. "An injury is also irreparable if the plaintiff does not have an adequate remedy at law, and a plaintiff does not have an adequate remedy at law if the defendant is insolvent." *Fischer v. Rider*, No. 02-10-00294-CV, 2011 WL 167226, at *5 (Tex. App.—Fort Worth Jan. 13, 2011, no pet.). In cases where an employee breaches a non-competition agreement, evidence that the employee continues to breach that agreement creates a rebuttable

33

presumption of irreparable injury. *See Tranter, Inc.*, 2014 WL 1257278, at \*1, \*7 (noting that an "employee's continued breach of a noncompete agreement creates a rebuttable presumption that the employer is suffering an irreparable injury" in a case where the employee was a "regional sales manager").

Despite these precedents, the trial court concluded that Morrison's Temporary Injunction Application should be denied, stating its view that Morrison had an adequate remedy at law. *See* App. 1. The trial court, however, failed to elaborate on how Morrison could have a remedy at law, except to note in its Letter that "[b]oth Plaintiffs testified that they are currently unemployed and have not provided any information covered by the said Agreements to the future [prospective] employer [National]," and "[b]oth Plaintiffs also testified that they did not solicit any of the Morrison employees or customers at this point . . . ." App. 2 at 2. While the trial court correctly summarized the Former Managers' testimony, that testimony is irrelevant because a TRO was in place during the temporary injunction hearing, and the Former Managers' testimony is otherwise contradicted by the record. *See supra* Facts Section IV. The trial court abused its discretion insofar as it concluded that Morrison has an adequate remedy at law.

1.  **Morrison Has Suffered Irreparable Harm—and Will Continue to Suffer Irreparable Harm—as a Result of the Former Managers' Actions.**

The record is clear that: (1) Morrison lost over 40 employees at its East Texas locations, *see* 4RR 72:3-9; (2) all of those employees reported directly or indirectly to the Former Managers, *see* 2RR 33:25-34:9; and (3) the Former Managers (a) spoke with numerous of Morrison's other employees about going to work for National, *see supra* Section I.A.3.a., (b) the Former Managers met with the President of National and Morrison employees, *see id.*, and (c) the Former Managers helped almost 30 Morrison employees resign by submitting their resignation forms, *see id.* These events, which resulted in Morrison losing more than 50% of its workforce in East Texas, materially harmed its name, reputation, and other elements of goodwill, impacted its ability to operate, and harmed its relationships with customers and vendors. *See* 3RR 126:15-127:21 (Hornsby testifying that the Former Managers' departure has harmed Morrison because, *inter alia*, they helped develop strategies and customer relationships and because their departure harmed Morrison's reputation among the customer base and suppliers); *cf.* 4RR 48:11-49:3 (a former Morrison employee testifying that an asset in this industry is strong customer relationships that are created over time).

Texas law is clear that these types of injuries constitute irreparable harm because they cannot easily be assigned a dollar amount. *See, e.g.*, *Frequent Flyer*

*Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied) ("Disruption to a business can be irreparable harm. Moreover, assigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy.") (internal citations omitted); *Martin v. Linen Sys. for Hosps., Inc.*, 671 S.W.2d 706, 710 (Tex. App.—Houston [1st Dist.] 1984, no writ) ("A dollar value cannot easily be assigned to a company's loss of clientele, goodwill, marketing techniques, office stability, etc.").

In addition to these injuries, Morrison faces the threat that its confidential information will be disclosed to a competitor that now is located in East Texas. As outlined above, the Former Managers received confidential information (*see supra* Facts Section I) and are employed by National (*see supra* Facts Section IV), thereby creating the threat that Morrison's confidential information may be disclosed. This type of threat constitutes an irreparable injury sufficient for injunctive relief. *See, e.g.*, *Brinks, Inc. v. Patrick*, No. 3:14-CV-775-B, 2014 WL 2931824, at *7 (N.D. Tex. June 27, 2014) (finding a threat of irreparable injury where an employee's responsibilities at a new employer were similar to those at the former employer, employee had confidential information, and employee was "intimately familiar with [former employer's] procedures, services and customer base"); *see also* 3RR 127:5-12 (Hornsby testifying that the Former Managers

36

"have an enormous amount of information related to [Morrison's] strategy" and that the potential harm caused by disclosure could not "be easily or clearly remedied with payment of money").

While these injuries and threatened injuries constitute irreparable harm under Texas law, it is also telling that the Former Managers *agreed* that "money damages would not be an adequate remedy for any breach of" the Agreements. App. 4 at 6; App. 5 at 6. Texas courts have concluded that such contractual provisions are further evidence that no adequate remedy exists for breaches of non-competition agreements. *See Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 294 (Tex. App.—Beaumont 2004, no pet.) (noting that such provisions are "substantive and probative evidence" that irreparable harm exists); *Poole v. U.S. Money Reserve, Inc.*, No. 09-08-137-CV, 2008 WL 4735602, at *9 (Tex. App.— Beaumont 2008, no pet.) (finding no error in trial court's determination of irreparable harm, in part because "appellants expressly agreed . . . that U.S. Money Reserve would suffer an irreparable injury if the restrictive covenants contained within the contracts are breached").[13]

---

[13] *See also Beasley v. Hub City, Tex., L.P.*, No. 01-03-00287-CV, 2003 WL 22254692, *8 (Tex. App.—Houston [1st Dist] Sept. 29, 2003, no pet.) (noting that a plaintiff "acknowledged in section six [of the agreement] that [defendant] would not have an adequate legal remedy if [plaintiff] breached the agreement, and that [defendant] thus had the right to seek injunctive relief").

In light of the foregoing, Morrison's injuries cannot be remedied by damages alone because—given that they are related to intangibles, such as its loss of clientele, goodwill, marketing techniques, and office stability—they are difficult to quantify. *Mabrey v. SandStream, Inc.*, 124 S.W.3d 302, 317 (Tex. App.—Fort Worth 2003, no pet.) (holding that damages are an inadequate remedy if they are difficult to calculate). Further, although some of Morrison's injuries likely could be quantified, that fact alone does not give Morrison an adequate remedy at law. *See Tex. Indus. Gas v. Phoenix Metallurgical Corp*., 828 S.W.2d 529, 532 (Tex. App.—Houston [1st Dist.] 1992, no writ) ("For a legal remedy to be adequate, it must give the applicant complete, final, and equal relief."); *see also Towers v. Grogan*, No. 01-97-00946-CV, 1998 WL 191760, at *4 (Tex. App.—Houston [1st Dist.] Apr. 23, 1998, no pet.) (holding that, although some damages were calculable, the damages for which Grogan sought injunctive relief were intangibles, incapable of being measured by damages).

In sum, the trial court's conclusion that Morrison has an adequate remedy at law is erroneous and constitutes an abuse of discretion.

2. The Trial Court's Conclusion Regarding an Adequate Remedy at Law Is Further Undermined by the Fact that the Former Managers Are Employed at National.

As noted, the trial court appeared to place significant weight on the Former Managers' testimony that they were not employed at National when the temporary

injunction hearing occurred. *See* App. 2 at 2. The trial court's reliance on this testimony was erroneous because it is contradicted both by evidence at the temporary injunction hearing as well as evidence that has since come to light.

At the temporary injunction hearing, Morrison's first witness, David Cunningham, testified that Anthony told him on April 13, 2015 (the same day Anthony resigned from Morrison) that "he was going to be the regional manager" at National. 2RR 15:13-22; *see* 2RR 22:24-23:2 ("Q. Mr. Cunningham, to be clear, the person who told you that Mike Anthony was region manager for National Wholesale Supply was who? A. Mike Anthony."). And Cunningham's testimony was confirmed by National's own website, which on April 13, 2015, showed that Anthony was the manager of the Kilgore branch and that Hilburn was the manager of the Tyler Branch. *See* 4RR 16:18-17:11; 5RR, Ex. 2 (screenshot of website).

Moreover, even assuming that the Former Managers were not employed at National during the temporary injunction hearing, that fact does not support the trial court's denial of Morrison's Temporary Injunction Application because the Former Managers were legally prohibited from working at National by the TRO that was in effect at the time of the hearing. *See* CR228. In any event, the Former Managers both testified that they intended to work for National as soon as possible—not after a year, which is the amount of time required under the valid Agreements they signed. *See* 2RR 25:19-21; 3RR 19:2-5. And now there can be

39

no dispute that Anthony and Hilburn are employed at National in violation of the enforceable Agreements they signed. *See* App. 8.

For the reasons stated, Morrison has shown that it has a probable right to the relief requested, and that it has a probable, imminent, and irreparable injury that cannot be remedied by damages alone. Morrison is entitled to a temporary injunction to maintain the status quo and to prevent the Former Managers from continuing to breach the non-competition and non-solicitation provisions in the enforceable Agreements they signed.

## II. The Trial Court Erred by Refusing to Reform the Agreements at the Temporary Injunction Stage, Thereby Preventing Morrison from Recovering Certain Damages.

Regardless of whether this Court reverses the trial court's denial of Morrison's Temporary Injunction Application, it should reverse and remand the action to the trial court with instructions to reform the Agreements so that Morrison can recover the damages that result from the Former Managers' ongoing breaches of the Agreements.

TEX. BUS. & COMM. CODE § 15.51(c) provides that a "court may not award the promisee damages for a breach of the covenant before its reformation," and also that a court "*shall*" reform a covenant in a non-competition agreement if it finds it to be unreasonable as to time, geographical area, or scope of activity. TEX. BUS. & COMM. CODE § 15.51(c); *see also Wright*, 137 S.W.3d at 298-99. In other

40

words, the statute prohibits courts from awarding damages for breaches of overbroad non-competition agreements incurred before those agreements are reformed, but it also requires courts to reform non-competition agreements "to the extent necessary to" make time, geographic, and scope-of-activity restrictions reasonable. TEX. BUS. & COMM. CODE § 15.51(c). The trial court found the Agreements to be overbroad as to geographic scope, *see* App. 2 at 1, and thus was required by the statute's plain langauge to reform the Agreements at the temporary injunction stage.

The trial court did not adhere to the requirements of Section 15.51(c) here, even though Morrison requested that the Agreements be reformed. *See, e.g.*, CR44; 4RR 74:9-75:23. In denying Morrison's Temporary Injunction Application, the trial court found the geographic restrictions in the Agreements to be overbroad, but it refused to reform the Agreements until a later date. *See* App. 2 at 1. The trial court's refusal to reform the Agreements only highlights its erroneous finding that Morrison has an adequate remedy at law because that decision puts Morrison is a "Catch-22": Morrison lacks any protection from a temporary injunction and *also* is barred from recovering damages from the Former Managers' continued breaches of the Agreements "pending a final trial." *Id.* This Court, at the very least, should follow the weight of recent authority and instruct the trial court to

41

reform the Agreements at the temporary injunction stage so that Morrison is not prevented from obtaining all relief.

The Fort Worth Court of Appeals' recent decision in *Tranter, Inc. v. Liss*, is instructive on this issue. There, the court determined that the relevant agreement was overbroad as to geographic scope and remanded the action to the trial court so it could reform the agreement before final judgment. *See Liss*, 2014 WL 1257278, at \*10. While one party in *Liss* argued that reformation only is proper as part of a final judgment, the court of appeals disagreed, holding that "reformation is not only a final remedy." *Id.* (collecting cases). The instructions in *Liss* comport with the weight of authority from state and federal courts within Texas, noting that reformation should be conducted **before** final judgment. *See, e.g.*, *TransPerfect Translations, Inc.*, 594 F. Supp. 2d at 756 (reforming agreement at temporary injunction stage and noting that (1) under section 15.51, "[t]he court need not wait for the parties to request [reformation]," and (2) "[s]ome Texas appeals courts have suggested, but not held, that reformation is appropriate at the temporary injunction stage);[14] *CDX Holdings, Inc. v. Heddon*, No. 12-CV-126, 2012 WL 11019355, at

---

[14] As noted, Morrison requested reformation in its Application for a Temporary Injunction and at the temporary injunction hearing. *See, e.g.*, CR44; 4RR 74:9-75:23.

*11 (N.D. Tex. Mar. 2, 2012) ("Some Texas court[s] have suggested that reformation may be appropriate at the temporary injunction stage.").[15]

Further, whether this Court reverses the trial court's denial of Morrison's temporary injunction application has no bearing on whether the trial court should be required to reform the Agreements at the temporary injunction stage. A decision on a temporary injunction is, by definition, preliminary, and such a decision should not be used to prevent Morrison from recovering damages based on the Former Managers' additional breaches of the Agreements before trial. That is especially true where, as here, there is no dispute as to the appropriate scope of the restriction. *See* App. 2 at 1 (finding the Agreements to be overbroad as to geographic scope); *see also* 4RR at 75:14-21 (Court noting that enforcement only is being sought in counties "where the people are actually working").

In light of these precedents—and given that the trial court already identified the overbroad geographic provision in the Agreements, which the parties do not dispute—this Court should instruct the trial court to reform the enforceable

---

[15] *Liss*, 2014 WL 1257278, at *10 (noting that "reformation is not only a final remedy" and collecting cases where courts have reformed agreements at the temporary injunction stage); *Poole*, 2008 WL 4735602, at *9 (holding that a temporary injunction was overly broad and remanding to the trial court to determine reasonable reformations); *Wright*, 137 S.W.3d at 298-99 (suggesting that reformation at the temporary injunction stage was appropriate, but remanding for additional fact-finding); *Bertotti v. C.E. Shepherd Co., Inc.*, 752 S.W.2d 648, 654 (Tex. App.—Houston [14th Dist.] 1988, no writ) (upholding temporary injunction and reforming the non-competition clause to include a geographic restriction).

Agreements so that Morrison is not prevented from recovering damages that result from the Former Managers' breaches going forward.

## CONCLUSION AND PRAYER

Morrison Supply Company, LLC and Patriot Supply Holdings, Inc. pray that this Court reverse the trial court's Order Denying Temporary Injunction and remand the action to the trial court with instructions to grant the requested temporary injunction. Additionally, Morrison Supply Company, LLC and Patriot Supply Holdings, Inc. pray that this Court reverse and remand the action to the trial court with instructions to reform the Agreements, so they are not prohibited from recovering damages caused by the Former Managers' additional breaches of the Agreements. Morrison Supply Company, LLC and Patriot Supply Holdings, Inc. also pray for all such further relief to which they are justly entitled.

Respectfully submitted,

*/s/ Vanessa Griffith*

Michael E. Starr
 State Bar No. 19078400
COGHLAN CROWSON LLP
1127 Judson Road
Suite 211
Longview, Texas 75606
903.758.5543
mstarr@ccfww.com

Vanessa Griffith
 State Bar No. 00790469
Thomas S. Leatherbury
 State Bar No. 12095275
Stephen S. Gilstrap
 State Bar No. 24078563
VINSON & ELKINS LLP
2001 Ross Avenue
Suite 3700
Dallas, Texas 75201-2975
214.220.7713
214.999.7713 (facsimile)
vgriffith@velaw.com
tleatherbury@velaw.com
sgilstrap@velaw.com

*Attorneys for Appellants Morrison Supply Company, LLC and Patriot Supply Holdings, Inc.*

45

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this Appellant's Brief complies with the applicable word count limitations in the Texas Rules of Appellate Procedure. This Brief contains 10,597 words, excluding the parts exempted by Tex. R. App. P. 9.4(i)(1). In making this certification, the undersigned has relied on the word-count function in Microsoft Word, which was used to prepare the Brief.

*/s/ Vanessa Griffith*
Vanessa Griffith

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served upon the following counsel of record via electronic filing or e-mail.pdf on June 24, 2015:

Trey Yarbrough
State Bar No. 22133500
Dallas W. Tharpe
State Bar No. 24052036
YARBROUGH WILCOX, PLLC
100 East Ferguson, Suite 1015
Tyler, Texas 75702
903-595-3111
trey@yw-lawfirm.com
dallas@yw-lawfirm.com

*/s/ Vanessa Griffith*
Vanessa Griffith

US 3580445

46

**INDEX OF APPENDIX MATERIALS**

| EXHIBIT NO. | DESCRIPTION OF EXHIBIT | RECORD CITATION |
|---|---|---|
| 1 | Order Denying Temporary Injunction (May 12, 2015) | CR 191 |
| 2 | Letter Attached to Order Denying Temporary Injunction (May 13, 2015) | CR189-90 |
| 3 | Temporary Sealing Order (May 12, 2015) | CR188 |
| 4 | Mike Anthony's Nonqualified Stock Option Award Agreement | 5RR, Ex. 3 |
| 5 | Scott Hilburn's Nonqualified Stock Option Award Agreement | 5RR, Ex. 7 |
| 6 | Email from Mike Anthony to Chip Hornsby with Signed Agreement (Dec. 19, 2012) | 5RR, Ex. 17 |
| 7 | Email from Scott Hilburn to Chip Hornsby with Signed Agreement (Dec. 18, 2012) | 5RR, Ex. 20 |
| 8 | Affidavit of Van Kelley (June 19, 2015) | Supp. CR15-16 |

US 3588272

# APPENDIX
# EXHIBIT 1



FILED
LOIS ROGERS
DISTRICT CLERK

2015 MAY 13 PM 4:26

SMITH COUNTY, TEXAS

BY_____

CAUSE NO. 15-0792-A

| | | |
|---|---|---|
| SCOTT HILBURN and | § | IN THE SEVENTH JUDICIAL |
| MIKE ANTHONY | § | SMITH COUNTY, TEXAS |
| | § | |
| VS. | § | |
| | § | DISTRICT COURT IN AND FOR |
| | § | |
| MORRISON SUPPLY COMPANY, LLC | § | |
| and PATRIOT SUPPLY HOLDINGS, INC. | § | SMITH      COUNTY,      TEXAS |

## ORDER DENYING TEMPORARY INJUNCTION

On April 27, 29 and 30, 2015, the Court heard and considered the (1) Defendants and Counter-Plaintiffs' Application for Temporary Injunction and (2) Defendants and Counter-Plaintiffs' Motion to Seal Court Records and for Temporary Sealing Order and (3) Plaintiffs and Counter-Defendants' Responses and Objections to same. The Court takes judicial notice of the Court's file and all evidence presented at said hearing by the parties and the supplemental submissions. The Court finds that the Plaintiffs have an adequate remedy at law concerning the claimed issues and the Temporary Injunction should be denied.

IT IS THEREFORE ORDERED that said Defendants and Counter-Plaintiffs' Application for Temporary Injunction is DENIED.

All relief not granted pertaining to said motions addresses herein is denied.

IT IS SO ORDERED.

SIGNED this 12th day of May, 2015.

HONORABLE KERRY L. RUSSELL
JUDGE PRESIDING

# APPENDIX
# EXHIBIT 2



# *Kerry L. Russell*

## JUDGE, SEVENTH JUDICIAL DISTRICT COURT
100 N. BROADWAY AVENUE ROOM 203
SMITH COUNTY COURTHOUSE
TYLER TEXAS 75702

Term Cochrum
Court Coordinator
Tina R. White
Assistant Court Coordinator

Jennifer Lawrance CSR
Court Reporter
903/590-1947

Facsimile
903 590-1641

Office Phone
903 590-1640

May 13, 2015

Mr. Trey Yarbrough
Mr. Dallas W. Tharpe
Yarbrough Wilcox, PLLC
100 E. Ferguson, Suite 1015
Tyler, TX   75702

Ms. Vanessa Griffith
Vinson & Elkins, LLP
2001 Ross Avenue, Suite 3700
Dallas, TX 75201

Mr. Michael E. Starr
Coghlan Crowson LLP
P O Box 2665
Longview, TX 75606

RE:   Cause No. 15-0792-A;
      Scott Hilburn and Mike Anthony
      vs.
      Morrison Supply Company, LLC and Patriot Supply Holdings, Inc.

Dear Counsel:

Please find enclosed the "Order Denying Temporary Injunction" and the "Order Granting Temporary Sealing" in connection with the above case. The case was heard on the afternoons of April 27, 29 and 30, 2015. The Court ended up permitting the Defendants to expand their two-hour time allotment to approximately three hours to present their evidence, and granted the Plaintiff the same time available. The Court is aware that the time limit created an abbreviated presentation by the Defendants without pre-trial discovery.

The Court finds that the "Patriot Supply Holdings, Inc. 2012 Stock Option Plan - Nonqualified Stock Option Award Agreement" signed by Anthony and Hilburn does not appear to be illusory (based upon the evidence presented thus far). The Court is still troubled by the application of Paragraph 19 Choice of Law and Paragraph 20 Consent to Jurisdiction provision of Delaware laws to a case being litigated in Texas. The Court finds Paragraphs 7, 8 and 9 to be ancillary to an otherwise enforceable agreement - the said Agreement as same is contained within the "Patriot Supply Holdings, Inc. 2012 Stock Option Plan - Nonqualified Stock Option Award Agreement" (as required by Marsh). The Court finds the agreement to be overbroad - as was impliedly admitted by the Defendants (at least as to geographic scope). The Court was not persuaded (at this point) that the Court should reform the agreement pending a final trial after appropriate discovery.

*Website: www.smith-county.com*

Both Plaintiffs testified that they are currently unemployed and have not provided any information covered by the said Agreements to the future perspective employer National Wholesale Supply, Inc. Both Plaintiffs also testified that they did not solicit any of the Morrison employees or customers at this point, but instead filed the subject suit to have their legal responsibilities determined.

The Court directs both Plaintiffs' and Defendants' counsel to confer and efile a Civil Case Joint Questionnaire within 20 days so the Court can enter a Pre-Trial Docket Control Scheduling Order and set an early trial date. The Court is aware that either party can pursue an appeal of the orders and that should be discussed as well as any scheduling problems.

Very truly yours,

KERRY L. RUSSELL
Presiding Judge

KLR/t

# APPENDIX
# EXHIBIT 3

FILED
LOIS ROGERS
DISTRICT CLERK

2015 MAY 13 PM 4 36

SMITH COUNTY, TEXAS
BY_____ DEPUTY

Cause No. 15-0792-A

| | | |
|---|---|---|
| SCOTT HILBURN and<br>MIKE ANTHONY | ) | IN THE DISTRICT COURT |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MORRISON SUPPLY COMPANY, LLC | ) | 7TH JUDICIAL DISTRICT |
| and PATRIOT SUPPLY HOLDINGS, INC. | ) | |
| | ) | |
| Defendants | ) | SMITH COUNTY, TEXAS |

## Temporary Sealing ORDER

Having considered Morrison Supply Company, LLC's and Patriot Supply Holdings, Inc.'s Motion to Seal Court Records and for Temporary Sealing Order, ^& Supplemental Brief it is, hereby ORDERED that Δ/Counter Plaintiffs' parties' Motion to Seal Court Records and for Temporary Sealing Order is GRANTED.

The exhibits X entered into evidence at the hearing on Defendants' Application for a Temporary Injunction containing Defendants' confidential and proprietary information may be filed under seal until such time as the Court directs. The transcript of the hearing held on April 27, 2015 regarding Application for a Temporary Injunction shall be held under seal until such time as the Court directs. A hearing regarding the sealing of these pleadings shall be held on June 22, 2015. at 1:30 p.m. The parties are directed to immediately give the public notice of such hearing pursuant to the requirements of Tex. R. Civ. P. 76(a)(3).

Entered this 12th day of May 2015.

X(Morrison Exhibits No:
9, 10, 11, 12, 22 + 23)

HON. KERRY L. RUSSELL

# APPENDIX

# EXHIBIT 4

**Patriot Supply Holdings, Inc.**
**2012 Stock Option Plan**

**NONQUALIFIED STOCK OPTION AWARD AGREEMENT**

THIS AGREEMENT (this "Award Agreement"), is made effective as of December 10, 2012 (the "Date of Grant"), by and between Patriot Supply Holdings, Inc., a Delaware corporation (the "Company"), and Mike Anthony (the "Participant"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Patriot Supply Holdings, Inc. 2012 Stock Option Plan (the "Plan").

**RECITALS:**

WHEREAS, the Committee has determined that it would be in the best interests of the Company and its stockholders to grant the option provided for herein to the Participant pursuant to the Plan and the terms set forth herein.

NOW THEREFORE, in consideration of the mutual covenants hereinafter set forth, the parties agree as follows:

1. Grant of the Option. The Company hereby grants to the Participant the right and option to purchase, on the terms and conditions set forth in the Plan and this Award Agreement, all or any part of an aggregate of 50 Shares (the "Option") at an Option Price of $1,130.00 per Share. Fifty percent (50%) of the Option shall be subject to time-based vesting criteria (the "Time Option") and fifty percent (50%) of the Option shall be subject to both time-based and performance-based vesting criteria (the "Performance Option"). The Option is intended to be a Nonqualified Stock Option.

2. Vesting. At any time, the portion of the Option which has become vested is hereinafter referred to as the "Vested Portion." Subject to the terms set forth in the Plan and this Award Agreement, the Option shall vest as follows:

    a. Time Option.

        i. General. The Time Option shall vest in five (5) equal annual installments on each of the first five (5) anniversaries of the Date of Grant, subject to the Participant's continued employment by the Company or its Subsidiaries through the applicable vesting date, such that twenty percent (20%) of the Time Option shall vest on each vesting date.

        ii. Change of Control. The Time Option shall vest in full upon the consummation of a Change of Control, subject to the Participant's continued employment by the Company or its Subsidiaries through the date the Change of Control is consummated.

        iii. Death of Permanent Disability. In the event that the Participant's employment with the Company or its Subsidiaries terminates due to death or Permanent Disability, the portion of the Time Option that was scheduled to vest pursuant to Section 2(a)(i) above during the one (1) year period following the date of the Participant's termination of employment shall vest upon such termination date.

    b. Performance Option. On each Measurement Date, the portion of the Performance Option that has vested shall be determined as set forth below. In no event shall any


EXHIBIT
3
MORRISON

Performance Option vest unless the Participant continues to be employed by the Company or its Subsidiaries on the applicable Measurement Date.

    i.  Tranche 1 Performance Option. Fifty percent (50%) of the Performance Option (the "**Tranche 1 Performance Option**") shall vest on any Measurement Date that the Advent Stockholders have received Proceeds resulting in an MOI equal to or exceeding 1.5, up to and including 2.0. For the avoidance of doubt, the Tranche 1 Performance Option shall not vest if the Advent Stockholders receive Proceeds resulting in an MOI of 1.5 or less.

    ii.  Tranche 2 Performance Option. Fifty (50%) of the Performance Option (the "**Tranche 2 Performance Option**") shall vest on any Measurement Date that the Advent Stockholders have received Proceeds resulting in an MOI of greater than 2.0. For the avoidance of doubt, the Tranche 2 Performance Option shall not vest if the Advent Stockholders receive Proceeds resulting in an MOI of 2.0 or less.

    iii.  Change of Control. The Performance Option shall, to the extent not then vested or forfeited, become vested upon a Change of Control only to the extent that the vesting criteria specified in this Section 2(b) are satisfied in connection therewith.

    iv.  Public Offering. Upon the consummation of a Public Offering the vesting criteria applicable to the Performance Option shall be modified such that the then unvested and unforfeited portion of the Performance Option shall become a Time Option which shall vest in three (3) equal annual installments on each of the first three (3) anniversaries of the consummation of the Public Offering, such that thirty three and one third percent (33.33%) of such unvested and unforfeited portion of the Performance Option shall vest on each such anniversary and the vesting provisions set forth in Section 2(a)(ii) and Section 2(a)(iii) shall apply to such unvested and unforfeited portion of the Performance Option from and after the date of the consummation of the Public Offering; provided, that, to the extent not previously vested or forfeited such unvested and unforfeited portion of the Performance Option shall vest in full on the date that is nine and one half (9 ½) years following the Date of Grant.

  3.  Forfeiture; Expiration.

    a.  Termination of Employment. Any unvested portion of the Option shall be forfeited without consideration upon the termination of the Participant's employment by the Company or its Subsidiaries for any reason, provided however, that in the event Participant's employment with the Company is terminated by the Company for any reason other than for Cause or the death or Permanent Disability of Participant, and within ninety (90) days following the date of such termination, there occurs a Change of Control, any unvested portion of the Option existing as of the date of termination shall become vested, to the extent that all other vesting criteria specified in this Agreement (specifically including the vesting criteria contained in Section 2(b) with regards to the Performance Option) are satisfied in connection with such Change of Control. In the event the Participant's employment is terminated for Cause or the Board determines that the Participant's acts or omissions constitute Cause, the Vested Portion also shall be forfeited without consideration upon such determination.

    b.  Breach of Restrictive Covenants. Any outstanding portion of the Option, including the Vested Portion, shall be forfeited without consideration if the Participant breaches Section 7 through Section 11 hereof.

    c.  Expiration of Option Term. Any unexercised portion of the Option shall expire upon the tenth (10th) anniversary of the Date of Grant.

4. Period of Exercise. Subject to the provisions of the Plan and this Award Agreement, the Participant may exercise all or any part of the Vested Portion at any time prior to the earliest to occur of:

    a. the tenth (10th) anniversary of the Date of Grant;

    b. the date that is ninety (90) days following termination of the Participant's employment with the Company or its Subsidiaries for any reason other than death, Permanent Disability or Cause;

    c. the date that is one (1) year following termination of the Participant's employment with the Company or its Subsidiaries due to death or Permanent Disability; and

    d. the date of termination of the Participant's employment with the Company or its Subsidiaries for Cause.

5. Exercise Procedures.

    a. Notice of Exercise. Subject to Section 4 hereof, the Vested Portion may be exercised by delivering to the Company at its principal office written notice of intent to so exercise in the form attached hereto as Exhibit A (such notice, a "**Notice of Exercise**"). Such Notice of Exercise shall be accompanied by payment in full of the aggregate Option Price for the Shares to be exercised. In the event the Option is being exercised by the Participant's representative, the Notice of Exercise shall be accompanied by proof (satisfactory to the Committee) of the representative's right to exercise the Option. The aggregate Option Price for the Shares to be exercised may be paid in cash or its equivalent (e.g., by cashiers check) or any other form of payment permitted by the Committee in accordance with Section 6.5 of the Plan.

    b. Method of Exercise. Neither the Participant nor the Participant's representative shall have any rights to dividends, voting rights or other rights of a stockholder with respect to Shares subject to the Option until the Participant has (i) given a Notice of Exercise of the Option, (ii) paid in full for such Shares, (iii) such Shares have been issued, (iv) the Participant has executed a joinder to or has otherwise become a party to the Stockholders Agreement and (v) if applicable, satisfied any other conditions imposed by the Committee pursuant to the Plan. In the event of the Participant's death, the Vested Portion shall be exercisable by the executor or administrator of the Participant's estate, or the person or persons to whom the Participant's rights under this Award Agreement shall pass by will or by the laws of descent and distribution, as the case may be. Any heir or legatee of the Participant shall take rights herein granted subject to the terms and conditions of this Award Agreement and the Plan.

6. Repurchase Election.

    a. General. In the event of termination of the Participant's employment with the Company or any Affiliate for any reason prior to a Public Offering, the Company, the Advent Stockholders or their designees (the "**Repurchasing Entity**") may elect to repurchase all or any portion of the Shares received by the Participant upon exercise of the Option (whether any such Shares are held by the Participant or one or more of the Participant's Permitted Transferees (as defined under the Stockholders Agreement) other than the Company) (the "**Repurchase Shares**") by delivering written notice (the "**Repurchase Notice**") to the Participant and his or her Permitted Transferees prior to the date that is 210 days following the later of (i) the date such Repurchase Shares were issued, or (ii) the date the Participant's employment was terminated. The Repurchase Notice shall set forth the number of Repurchase Shares to be acquired from the Participant, the aggregate consideration to be paid for such Repurchase Shares and the time and place for the closing of the transactions. The closing of the purchase

3

of the Repurchase Shares shall take place on the date designated by the Repurchasing Entity in the Repurchase Notice, which date shall not be more than sixty (60) days following the date the Repurchase Notice is given nor less than seven (7) days after the delivery of the Repurchase Notice.

b. <u>Repurchase Price</u>. The purchase price for the Repurchase Shares (the "**Repurchase Price**") shall be the Fair Market Value of such Repurchase Shares as of the date of the Repurchase Notice; <u>provided</u>, that if the Participant's employment is terminated by the Company for Cause or the Board determines that a Participant's acts or omissions constitute Cause, the Repurchase Price shall be the lesser of (i) the actual out-of-pocket cost paid by the Participant for such Repurchase Shares and (ii) the Fair Market Value of such Repurchase Shares.

c. <u>Breach of Restrictive Covenants</u>. If the Participant breaches any provision of <u>Section 7</u> through <u>Section 11</u> hereof, regardless of whether such breach occurs prior to or following a Public Offering, the Company may elect in its sole discretion to require the Participant to repay the Repurchase Price to the Repurchasing Entity, as applicable, less any Option Price paid by the Participant with respect to such Repurchase Shares, within thirty (30) days of the date the Company becomes aware of such breach.

d. <u>Consideration</u>. The Repurchasing Entity shall pay the Repurchase Price, at its election, (i) by a check or wire transfer of funds or (ii) to the extent payment of the Repurchase Price in cash would adversely affect the Company's or any Subsidiary's liquidity or would be restricted by the Company's or any Subsidiary's financing arrangements, in each case, as determined by the Board in good faith, by a subordinated non-amortizing note with a three (3) year term beginning on the closing date of the purchase of the Repurchase Shares (the "**Note**"). The Note shall be subject to required prepayment upon the earlier of (A) a Change of Control, or (B) the next succeeding anniversary of the date the Note was issued following the date that payment of the Repurchase Price in cash would no longer adversely affect the Company's or any Subsidiary's liquidity or would be restricted by the Company's or any Subsidiary's financing arrangements, in each case, as determined by the Board in good faith. The Note shall bear interest (payable quarterly) at a rate per annum equal to the prime rate as published in The Wall Street Journal from time to time plus two percent (2%). Payment of the Repurchase Price shall be made after offset of any bona fide debts owed by the Participant to the Repurchasing Entity, subject to the requirements of Section 409A of the Code.

7. <u>Confidential Information</u>. The Participant acknowledges that during the period of employment the Participant shall have access to and shall be provided with sensitive, confidential, proprietary and trade secret information of the Company and its Affiliates, (including, in each case, such information, observations and data obtained prior to the date of this Agreement concerning the business or affairs of the Company, its Affiliates and their respective predecessors) (collectively, "**Confidential Information**") which is the property of the Company and such Affiliates and agrees that the Company and such Affiliates have a protectable interest in such Confidential Information. Therefore, the Participant agrees that the Participant shall not (during the period of employment and at all times thereafter) disclose to any unauthorized person or use for Participant's own purposes any such Confidential Information without the prior written consent of the Company unless and to the extent that the aforementioned matters (a) become or are generally known to and available for use by the industry other than as a result of the Participant's unauthorized acts or omissions in breach of this Agreement, (b) are required to be disclosed by judicial process or law or (c) are in furtherance of the Participant's duties to the Company or its Affiliates. The Participant shall deliver to the Company at the termination of the employment period, or at any other time the Company may request, (y) all memoranda, notes, plans, records, reports, computer tapes, printouts and software and other documents and data (and copies thereof) which constitute Confidential Information which the Participant may then possess or have under Participant's control and (z) all property of the Company and its Affiliates in the Participant's possession,

including but not limited to all company-owned computer equipment (hardware and software), telephones, facsimile machines, blackberry and other communication devices, credit cards, office keys, security access cards, badges, and identification cards.

8.　Non-Competition. In consideration of the Option granted to the Participant hereunder, the Participant acknowledges that in the course of the Participant's employment with the Company or its Affiliates the Participant has become and shall become familiar with trade secrets and other Confidential Information concerning the Company and their Affiliates and that the Participant's services have been and shall be of special, unique and extraordinary value to the Company and its Affiliates. Therefore, the Participant agrees that, during the period of Participant's employment with the Company or its Affiliates and for one (1) year thereafter (the "**Restrictive Period**"), the Participant shall not engage, directly or indirectly in the Business anywhere in the United States or, without the prior written consent of the Board, directly or indirectly, own an interest in, manage, operate, join, control, lend money or render financial or other assistance to or participate in or be connected with, as an officer, employee, partner, stockholder, consultant or otherwise, any Person that competes with the Business; provided, that, for purposes of this Section 8, ownership of securities having no more than two percent (2%) of the outstanding voting power of any publicly traded competitor shall not be deemed to be in violation of this Section 8. The Participant expressly agrees and acknowledges that the restrictions contained in this Section 8 do not preclude the Participant from earning a livelihood, nor do they unreasonably impose limitations on the Participant's ability to earn a living. In addition, the Participant agrees and acknowledges that the potential harm to the Company and its Affiliates of their non-enforcement outweighs any harm to the Participant of its enforcement by injunction or otherwise. The Participant expressly acknowledges and agrees that each and every restraint imposed by this Agreement is reasonable with respect to the subject matter, time period and geographical area. The Restrictive Period shall be extended by the length of any period during with the Participant is in breach of the terms of this Section 8 or Section 9.

9.　Non-Solicitation. The Participant agrees that, during the Restrictive Period, the Participant shall not (a) induce or attempt to induce any customer, supplier or other party with whom the Company or any Affiliate do business to cease doing business with the Company or such Affiliates, or in any way interfere with or attempt to interfere with the relationship between the Company and its Affiliates and any existing customer, supplier or other party with whom the Company or its Affiliates do business or (b) hire, employ or in any way, directly or indirectly, interfere with or attempt to interfere with any officers, employees, representatives or agents of the Company and its Affiliates, or induce or attempt to induce any of them to leave the employ of the Company or its Affiliates, as applicable, or violate the terms of their contracts, or any employment arrangements, with the Company or its Affiliates; provided, that while the foregoing shall not prohibit a general solicitation to the public by general advertising, hiring any person identified in this Section 9 as a result of such general solicitation is prohibited during the Restrictive Period.

10.　Non-Disparagement. The Participant agrees, during the period of employment and at all times thereafter, that the Participant shall not, directly or indirectly, whether orally or in writing, for herself/himself or on behalf of any other Person libel, slander or disparage the Company, its Affiliates or any of their respective businesses, services, directors, officers, managers, shareholders, representatives or business relations.

11.　Participant's Representations; Restriction on Use of Third Party Confidential Information. The Participant hereby represents and warrants that (a) the execution, delivery and performance of this Agreement by the Participant and the execution of the Company's business plan by the Participant do not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order or judgment to which the Participant is a party or by which the Participant is

bound, (b) the Participant is not a party to or bound by any employment agreement, non-compete agreement or confidentiality agreement with any person or entity other than the Company or its Affiliates, and (c) this Agreement constitutes the valid and binding obligation of the Participant, enforceable against the Participant in accordance with its terms. The Participant shall not improperly use any confidential information or trade secrets of any third party in connection with the performance of the Participant's duties. The Participant hereby acknowledges and represents that the Participant has had the opportunity to consult with independent legal counsel regarding the Participant's rights and obligations under this Agreement and fully understands the terms and conditions contained herein.

12. **Enforcement**. If, at the time of enforcement of any of Section 7 through Section 11, a court or an arbitrator shall hold that the duration, scope or area restrictions stated therein are unreasonable under the circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court or arbitrator shall be allowed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by law. Because the Participant's services are unique and because the Participant has access to Confidential Information, the parties hereto agree that money damages would not be an adequate remedy for any breach of this Agreement. Therefore, in the event of a breach or threatened breach of this Agreement, the Company or its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof (without posting a bond or other security).

13. **No Right to Continued Service**. The granting of the Option shall impose no obligation on the Company or any Subsidiary to continue the employment of the Participant and shall not lessen or affect any right that the Company or any Subsidiary may have to terminate the employment of the Participant.

14. **Withholding**. The Company shall have the power and the right to deduct or withhold automatically from any payment or Shares deliverable under this Award Agreement, or require the Participant to remit to the Company, the minimum statutory amount to satisfy federal, state, and local taxes, domestic or foreign, required by law or regulation to be withheld with respect to any taxable event arising as a result of this Award Agreement. The Participant may elect, subject to the approval of the Committee, in its sole discretion, to satisfy the withholding requirement, in whole or in part, by having the Company withhold Shares having a Fair Market Value equal to the minimum statutory total tax that could be imposed in connection with any such taxable event.

15. **Transferability**. Unless otherwise determined by the Committee, the Participant shall not be permitted to transfer or assign the Option except in the event of death and in accordance with Section 14.5 of the Plan.

16. **Adjustment of Option**. Adjustments to the Options (or any Shares underlying the Option) shall be made in accordance with the terms of the Plan.

17. **Definitions**. For purposes of this Award Agreement:

a. **"Advent Stockholders Securities"** means the equity securities and, if any, debt securities of the Company acquired by the Advent Stockholders, whether acquired before or after the Date of Grant.

6

b. **"Business"** means the business of the Company and its Subsidiaries as currently conducted on the date hereof, as conducted within the five (5) years prior to the date hereof, or which the Board has authorized the Company to develop or pursue (by acquisition or otherwise).

c. **"Measurement Date"** means any date upon which Proceeds are received by the Advent Stockholders.

d. **"MOI"** means, as of any Measurement Date, the quotient obtained by dividing (i) the sum of Proceeds received on such Measurement Date and all prior Measurement Dates, by (ii) the Principal Investment.

e. **"Permanent Disability"** means a determination by independent competent medical authority (selected by the Board) that the Participant is unable to perform his duties and in all reasonable medical likelihood such inability shall continue for a period in excess of 120 days in any 365 day period; provided, that, if the Participant has an employment agreement that defines "Permanent Disability" or a like term, "Permanent Disability" shall have the meaning set forth in such agreement.

f. **"Principal Investment"** means the sum, without duplication, of: (i) the aggregate consideration paid by the Advent Stockholders to acquire the Advent Stockholders Securities, plus (ii) the amount of cash and the value (as determined by the Board in good faith) of any property contributed by the Advent Stockholders to the Company, whether contributed before or after the Date of Grant.

g. **"Proceeds"** means, without duplication: (i) cash proceeds actually received by the Advent Stockholders or their Affiliates from the disposition of the Advent Stockholders Securities, net of Unreimbursed Transaction Expenses, (ii) cash dividends and other cash distributions actually received by the Advent Stockholders or their Affiliates in respect of the Advent Stockholders Securities, and (iii) cash proceeds actually received by the Advent Stockholders or their Affiliates from the disposition of any non-cash proceeds (including non-cash dividends or other non-cash distributions) received in exchange for or in respect of the Advent Stockholders Securities (net of Unreimbursed Transaction Expenses). For the avoidance of doubt, any property other than cash (including marketable securities) that the Advent Stockholders or their Affiliates receive or retain in connection with a Change of Control or otherwise shall not be treated as Proceeds received by the Advent Stockholders or their Affiliates, however, cash received by the Advent Stockholders or their Affiliates from the disposition of such property shall be treated as Proceeds, if any, if and when such cash actually is received by the Advent Stockholders or their Affiliates.

h. **"Public Offering"** has the meaning set forth in the Stockholders Agreement.

i. **"Unreimbursed Transaction Expenses"** means all reasonable legal, accounting and investment banking fees, other than amounts paid to the Advent Stockholders and their Affiliates, that are not reimbursed by unrelated third parties.

18. Option Subject to Plan. By entering into this Award Agreement the Participant agrees and acknowledges that the Participant has received and read a copy of the Plan. The Option is subject to the terms and conditions of the Plan. In the event of a conflict between any term hereof and a term of the Plan, the applicable term of the Plan shall govern and prevail.

19. Choice of Law. This Award Agreement, and all claims or causes of action or other matters that may be based upon, arise out of or relate to this Award Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, excluding any conflict or choice of law

7

rule or principle that might otherwise refer construction or interpretation thereof to the substantive laws of another jurisdiction.

20. <u>Consent to Jurisdiction</u>. The Company and the Participant, by his or her execution hereof, (a) hereby irrevocably submit to the exclusive jurisdiction of the state and federal courts in the State of Delaware for the purposes of any claim or action arising out of or based upon this Award Agreement or relating to the subject matter hereof, (b) hereby waive, to the extent not prohibited by applicable law, and agree not to assert by way of motion, as a defense or otherwise, in any such claim or action, any claim that it or he is not subject personally to the jurisdiction of the above-named courts, that its, his or her property is exempt or immune from attachment or execution, that any such proceeding brought in the above-named court is improper or that this Award Agreement or the subject matter hereof may not be enforced in or by such court and (c) hereby agree not to commence any claim or action arising out of or based upon this Award Agreement or relating to the subject matter hereof other than before the above-named courts nor to make any motion or take any other action seeking or intending to cause the transfer or removal of any such claim or action to any court other than the above-named courts whether on the grounds of inconvenient forum or otherwise. The Company and the Participant hereby consent to service of process in any such proceeding, and agree that service of process by registered or certified mail, return receipt requested, at its address specified pursuant to <u>Section 23</u> is reasonably calculated to give actual notice.

21. <u>WAIVER OF JURY TRIAL</u>. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES AND COVENANTS THAT HE SHE OR IT SHALL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE OR ACTION, CLAIM, CAUSE OF ACTION OR SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED HEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING. EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTY HERETO THAT THIS <u>SECTION 21</u> CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH THEY ARE RELYING AND SHALL RELY IN ENTERING INTO THIS AGREEMENT. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 21</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

22. <u>Shares Not Registered</u>. Shares shall not be issued pursuant to this Award Agreement unless the issuance and delivery of such Shares comply with (or are exempt from) all applicable requirements of law, including, without limitation, the Securities Act of 1933, as amended, the rules and regulations promulgated thereunder, state securities laws and regulations, and the regulations of any stock exchange or other securities market on which the Company's securities may then be traded. The Company shall not be obligated to file any registration statement under any applicable securities laws to permit the purchase or issuance of any Shares, and accordingly any certificates for Shares may have an appropriate legend or statement of applicable restrictions endorsed thereon. If the Company deems it necessary to ensure that the issuance of Shares under this Award Agreement is not required to be registered under any applicable securities laws, the Participant shall deliver to the Company an agreement containing such representations, warranties and covenants as the Company may reasonably require.

23. <u>Notices</u>. Any notice or other communication provided for herein or given hereunder to a party hereto must be in writing, and shall be deemed to have been given (a) when personally delivered or delivered by facsimile transmission with confirmation of delivery, (b) one (1) business day after deposit

8

with Federal Express or similar overnight courier service, or (c) three (3) business days after being mailed by first class mail, return receipt requested. A notice shall be addressed to the Company at its principal executive office, attention Chief Executive Officer and to the Participant at the address that he or she most recently provided to the Company.

24.     Entire Agreement. This Award Agreement, including Exhibit A attached hereto and the Plan, constitute the entire agreement and understanding among the parties hereto in respect of the subject matter hereof and supersede all prior and contemporaneous arrangements, agreements and understandings, whether oral or written and whether express or implied, and whether in term sheets, presentations or otherwise, among the parties hereto, or between any of them, with respect to the subject matter hereof; provided, that, the Participant shall continue to be bound by any other confidentiality, non-competition, non-solicitation and other similar restrictive covenants contained in any other agreements between the Participant and the Company, its Affiliates and their respective predecessors to which the Participant is bound. In the event of any inconsistency between any restrictive covenants contained herein and any restrictive covenants contained in such other agreements, that obligation which is most restrictive upon the Participant shall control.

25.     Amendment; Waiver. No amendment or modification of any term of this Award Agreement shall be effective unless signed in writing by or on behalf of the Company and the Participant, except that the Company may amend or modify this Award Agreement without the Participant's consent in accordance with the terms of the Plan or as otherwise set forth herein. No waiver of any breach or condition of this Award Agreement shall be deemed to be a waiver of any other or subsequent breach or condition whether of like or different nature.

26.     Successors and Assigns; No Third Party Beneficiaries. The provisions of this Award Agreement shall inure to the benefit of, and be binding upon, the Company and its successors and assigns and upon the Participant and the Participant's heirs, successors, legal representatives and permitted assigns. Nothing in this Award Agreement, express or implied, is intended to confer on any person other than the Company and the Participant, and their respective heirs, successors, legal representatives and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Award Agreement.

27.     Signature in Counterparts. This Award Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

*              *              *

9

IN WITNESS WHEREOF, the parties hereto have executed this Award Agreement.

PATRIOT SUPPLY HOLDINGS, INC.

By: _____
Claude A. S. Hornsby
Chief Executive Officer

Agreed and acknowledged as

of the date first above written:

_____
Mike Anthony

F:\Momimm LLC\Patriot Supply\Option Plan\Option Award Agreement (M. Anthony).doc

10

# APPENDIX

# EXHIBIT 5

**Patriot Supply Holdings, Inc.**
**2012 Stock Option Plan**

### NONQUALIFIED STOCK OPTION AWARD AGREEMENT

THIS AGREEMENT (this "Award Agreement"), is made effective as of December 10, 2012 (the "Date of Grant"), by and between Patriot Supply Holdings, Inc., a Delaware corporation (the "Company"), and Scott Hilburn (the "Participant"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Patriot Supply Holdings, Inc. 2012 Stock Option Plan (the "Plan").

### RECITALS:

WHEREAS, the Committee has determined that it would be in the best interests of the Company and its stockholders to grant the option provided for herein to the Participant pursuant to the Plan and the terms set forth herein.

NOW THEREFORE, in consideration of the mutual covenants hereinafter set forth, the parties agree as follows:

1.      Grant of the Option. The Company hereby grants to the Participant the right and option to purchase, on the terms and conditions set forth in the Plan and this Award Agreement, all or any part of an aggregate of 50 Shares (the "Option") at an Option Price of $1,130.00 per Share. Fifty percent (50%) of the Option shall be subject to time-based vesting criteria (the "Time Option") and fifty percent (50%) of the Option shall be subject to both time-based and performance-based vesting criteria (the "Performance Option"). The Option is intended to be a Nonqualified Stock Option.

2.      Vesting. At any time, the portion of the Option which has become vested is hereinafter referred to as the "Vested Portion." Subject to the terms set forth in the Plan and this Award Agreement, the Option shall vest as follows:

a.      Time Option.

i.      General. The Time Option shall vest in five (5) equal annual installments on each of the first five (5) anniversaries of the Date of Grant, subject to the Participant's continued employment by the Company or its Subsidiaries through the applicable vesting date, such that twenty percent (20%) of the Time Option shall vest on each vesting date.

ii.      Change of Control. The Time Option shall vest in full upon the consummation of a Change of Control, subject to the Participant's continued employment by the Company or its Subsidiaries through the date the Change of Control is consummated.

iii.      Death of Permanent Disability. In the event that the Participant's employment with the Company or its Subsidiaries terminates due to death or Permanent Disability, the portion of the Time Option that was scheduled to vest pursuant to Section 2(a)(i) above during the one (1) year period following the date of the Participant's termination of employment shall vest upon such termination date.

b.      Performance Option. On each Measurement Date, the portion of the Performance Option that has vested shall be determined as set forth below. In no event shall any



EXHIBIT

7

MORRISON

Performance Option vest unless the Participant continues to be employed by the Company or its Subsidiaries on the applicable Measurement Date.

                i.        Tranche 1 Performance Option. Fifty percent (50%) of the Performance Option (the "**Tranche 1 Performance Option**") shall vest on any Measurement Date that the Advent Stockholders have received Proceeds resulting in an MOI equal to or exceeding 1.5, up to and including 2.0. For the avoidance of doubt, the Tranche 1 Performance Option shall not vest if the Advent Stockholders receive Proceeds resulting in an MOI of 1.5 or less.

                ii.        Tranche 2 Performance Option. Fifty (50%) of the Performance Option (the "**Tranche 2 Performance Option**") shall vest on any Measurement Date that the Advent Stockholders have received Proceeds resulting in an MOI of greater than 2.0. For the avoidance of doubt, the Tranche 2 Performance Option shall not vest if the Advent Stockholders receive Proceeds resulting in an MOI of 2.0 or less.

                iii.        Change of Control. The Performance Option shall, to the extent not then vested or forfeited, become vested upon a Change of Control only to the extent that the vesting criteria specified in this Section 2(b) are satisfied in connection therewith.

                iv.        Public Offering. Upon the consummation of a Public Offering the vesting criteria applicable to the Performance Option shall be modified such that the then unvested and unforfeited portion of the Performance Option shall become a Time Option which shall vest in three (3) equal annual installments on each of the first three (3) anniversaries of the consummation of the Public Offering, such that thirty three and one third percent (33.33%) of such unvested and unforfeited portion of the Performance Option shall vest on each such anniversary and the vesting provisions set forth in Section 2(a)(ii) and Section 2(a)(iii) shall apply to such unvested and unforfeited portion of the Performance Option from and after the date of the consummation of the Public Offering; provided, that, to the extent not previously vested or forfeited such unvested and unforfeited portion of the Performance Option shall vest in full on the date that is nine and one half (9 ½) years following the Date of Grant.

     3.      Forfeiture; Expiration.

          a.        Termination of Employment. Any unvested portion of the Option shall be forfeited without consideration upon the termination of the Participant's employment by the Company or its Subsidiaries for any reason, provided however, that in the event Participant's employment with the Company is terminated by the Company for any reason other than for Cause or the death or Permanent Disability of Participant, and within ninety (90) days following the date of such termination, there occurs a Change of Control, any unvested portion of the Option existing as of the date of termination shall become vested, to the extent that all other vesting criteria specified in this Agreement (specifically including the vesting criteria contained in Section 2(b) with regards to the Performance Option) are satisfied in connection with such Change of Control. In the event the Participant's employment is terminated for Cause or the Board determines that the Participant's acts or omissions constitute Cause, the Vested Portion also shall be forfeited without consideration upon such determination.

          b.        Breach of Restrictive Covenants. Any outstanding portion of the Option, including the Vested Portion, shall be forfeited without consideration if the Participant breaches Section 7 through Section 11 hereof.

          c.        Expiration of Option Term. Any unexercised portion of the Option shall expire upon the tenth (10th) anniversary of the Date of Grant.

2

4. Period of Exercise. Subject to the provisions of the Plan and this Award Agreement, the Participant may exercise all or any part of the Vested Portion at any time prior to the earliest to occur of:

a. the tenth (10th) anniversary of the Date of Grant;

b. the date that is ninety (90) days following termination of the Participant's employment with the Company or its Subsidiaries for any reason other than death, Permanent Disability or Cause;

c. the date that is one (1) year following termination of the Participant's employment with the Company or its Subsidiaries due to death or Permanent Disability; and

d. the date of termination of the Participant's employment with the Company or its Subsidiaries for Cause.

5. Exercise Procedures.

a. Notice of Exercise. Subject to Section 4 hereof, the Vested Portion may be exercised by delivering to the Company at its principal office written notice of intent to so exercise in the form attached hereto as Exhibit A (such notice, a "Notice of Exercise"). Such Notice of Exercise shall be accompanied by payment in full of the aggregate Option Price for the Shares to be exercised. In the event the Option is being exercised by the Participant's representative, the Notice of Exercise shall be accompanied by proof (satisfactory to the Committee) of the representative's right to exercise the Option. The aggregate Option Price for the Shares to be exercised may be paid in cash or its equivalent (e.g., by cashiers check) or any other form of payment permitted by the Committee in accordance with Section 6.5 of the Plan.

b. Method of Exercise. Neither the Participant nor the Participant's representative shall have any rights to dividends, voting rights or other rights of a stockholder with respect to Shares subject to the Option until the Participant has (i) given a Notice of Exercise of the Option, (ii) paid in full for such Shares, (iii) such Shares have been issued, (iv) the Participant has executed a joinder to or has otherwise become a party to the Stockholders Agreement and (v) if applicable, satisfied any other conditions imposed by the Committee pursuant to the Plan. In the event of the Participant's death, the Vested Portion shall be exercisable by the executor or administrator of the Participant's estate, or the person or persons to whom the Participant's rights under this Award Agreement shall pass by will or by the laws of descent and distribution, as the case may be. Any heir or legatee of the Participant shall take rights herein granted subject to the terms and conditions of this Award Agreement and the Plan.

6. Repurchase Election.

a. General. In the event of termination of the Participant's employment with the Company or any Affiliate for any reason prior to a Public Offering, the Company, the Advent Stockholders or their designees (the "Repurchasing Entity") may elect to repurchase all or any portion of the Shares received by the Participant upon exercise of the Option (whether any such Shares are held by the Participant or one or more of the Participant's Permitted Transferees (as defined under the Stockholders Agreement) other than the Company) (the "Repurchase Shares") by delivering written notice (the "Repurchase Notice") to the Participant and his or her Permitted Transferees prior to the date that is 210 days following the later of (i) the date such Repurchase Shares were issued, or (ii) the date the Participant's employment was terminated. The Repurchase Notice shall set forth the number of Repurchase Shares to be acquired from the Participant, the aggregate consideration to be paid for such Repurchase Shares and the time and place for the closing of the transactions. The closing of the purchase

of the Repurchase Shares shall take place on the date designated by the Repurchasing Entity in the Repurchase Notice, which date shall not be more than sixty (60) days following the date the Repurchase Notice is given nor less than seven (7) days after the delivery of the Repurchase Notice.

b. <u>Repurchase Price</u>. The purchase price for the Repurchase Shares (the "**Repurchase Price**") shall be the Fair Market Value of such Repurchase Shares as of the date of the Repurchase Notice; provided, that if the Participant's employment is terminated by the Company for Cause or the Board determines that a Participant's acts or omissions constitute Cause, the Repurchase Price shall be the lesser of (i) the actual out-of-pocket cost paid by the Participant for such Repurchase Shares and (ii) the Fair Market Value of such Repurchase Shares.

c. <u>Breach of Restrictive Covenants</u>. If the Participant breaches any provision of <u>Section 7</u> through <u>Section 11</u> hereof, regardless of whether such breach occurs prior to or following a Public Offering, the Company may elect in its sole discretion to require the Participant to repay the Repurchase Price to the Repurchasing Entity, as applicable, less any Option Price paid by the Participant with respect to such Repurchase Shares, within thirty (30) days of the date the Company becomes aware of such breach.

d. <u>Consideration</u>. The Repurchasing Entity shall pay the Repurchase Price, at its election, (i) by a check or wire transfer of funds or (ii) to the extent payment of the Repurchase Price in cash would adversely affect the Company's or any Subsidiary's liquidity or would be restricted by the Company's or any Subsidiary's financing arrangements, in each case, as determined by the Board in good faith, by a subordinated non-amortizing note with a three (3) year term beginning on the closing date of the purchase of the Repurchase Shares (the "Note"). The Note shall be subject to required prepayment upon the earlier of (A) a Change of Control, or (B) the next succeeding anniversary of the date the Note was issued following the date that payment of the Repurchase Price in cash would no longer adversely affect the Company's or any Subsidiary's liquidity or would be restricted by the Company's or any Subsidiary's financing arrangements, in each case, as determined by the Board in good faith. The Note shall bear interest (payable quarterly) at a rate per annum equal to the prime rate as published in The Wall Street Journal from time to time plus two percent (2%). Payment of the Repurchase Price shall be made after offset of any bona fide debts owed by the Participant to the Repurchasing Entity, subject to the requirements of Section 409A of the Code.

7. <u>Confidential Information</u>. The Participant acknowledges that during the period of employment the Participant shall have access to and shall be provided with sensitive, confidential, proprietary and trade secret information of the Company and its Affiliates, (including, in each case, such information, observations and data obtained prior to the date of this Agreement concerning the business or affairs of the Company, its Affiliates and their respective predecessors) (collectively, "**Confidential Information**") which is the property of the Company and such Affiliates and agrees that the Company and such Affiliates have a protectable interest in such Confidential Information. Therefore, the Participant agrees that the Participant shall not (during the period of employment and at all times thereafter) disclose to any unauthorized person or use for Participant's own purposes any such Confidential Information without the prior written consent of the Company unless and to the extent that the aforementioned matters (a) become or are generally known to and available for use by the industry other than as a result of the Participant's unauthorized acts or omissions in breach of this Agreement, (b) are required to be disclosed by judicial process or law or (c) are in furtherance of the Participant's duties to the Company or its Affiliates. The Participant shall deliver to the Company at the termination of the employment period, or at any other time the Company may request, (y) all memoranda, notes, plans, records, reports, computer tapes, printouts and software and other documents and data (and copies thereof) which constitute Confidential Information which the Participant may then possess or have under Participant's control and (z) all property of the Company and its Affiliates in the Participant's possession,

4

including but not limited to all company-owned computer equipment (hardware and software), telephones, facsimile machines, blackberry and other communication devices, credit cards, office keys, security access cards, badges, and identification cards.

8. Non-Competition. In consideration of the Option granted to the Participant hereunder, the Participant acknowledges that in the course of the Participant's employment with the Company or its Affiliates the Participant has become and shall become familiar with trade secrets and other Confidential Information concerning the Company and their Affiliates and that the Participant's services have been and shall be of special, unique and extraordinary value to the Company and its Affiliates. Therefore, the Participant agrees that, during the period of Participant's employment with the Company or its Affiliates and for one (1) year thereafter (the "**Restrictive Period**"), the Participant shall not engage, directly or indirectly in the Business anywhere in the United States or, without the prior written consent of the Board, directly or indirectly, own an interest in, manage, operate, join, control, lend money or render financial or other assistance to or participate in or be connected with, as an officer, employee, partner, stockholder, consultant or otherwise, any Person that competes with the Business; provided, that, for purposes of this Section 8, ownership of securities having no more than two percent (2%) of the outstanding voting power of any publicly traded competitor shall not be deemed to be in violation of this Section 8. The Participant expressly agrees and acknowledges that the restrictions contained in this Section 8 do not preclude the Participant from earning a livelihood, nor do they unreasonably impose limitations on the Participant's ability to earn a living. In addition, the Participant agrees and acknowledges that the potential harm to the Company and its Affiliates of their non-enforcement outweighs any harm to the Participant of its enforcement by injunction or otherwise. The Participant expressly acknowledges and agrees that each and every restraint imposed by this Agreement is reasonable with respect to the subject matter, time period and geographical area. The Restrictive Period shall be extended by the length of any period during with the Participant is in breach of the terms of this Section 8 or Section 9.

9. Non-Solicitation. The Participant agrees that, during the Restrictive Period, the Participant shall not (a) induce or attempt to induce any customer, supplier or other party with whom the Company or any Affiliate do business to cease doing business with the Company or such Affiliates, or in any way interfere with or attempt to interfere with the relationship between the Company and its Affiliates and any existing customer, supplier or other party with whom the Company or its Affiliates do business or (b) hire, employ or in any way, directly or indirectly, interfere with or attempt to interfere with any officers, employees, representatives or agents of the Company and its Affiliates, or induce or attempt to induce any of them to leave the employ of the Company or its Affiliates, as applicable, or violate the terms of their contracts, or any employment arrangements, with the Company or its Affiliates; provided, that while the foregoing shall not prohibit a general solicitation to the public by general advertising, hiring any person identified in this Section 9 as a result of such general solicitation is prohibited during the Restrictive Period.

10. Non-Disparagement. The Participant agrees, during the period of employment and at all times thereafter, that the Participant shall not, directly or indirectly, whether orally or in writing, for herself/himself or on behalf of any other Person libel, slander or disparage the Company, its Affiliates or any of their respective businesses, services, directors, officers, managers, shareholders, representatives or business relations.

11. Participant's Representations; Restriction on Use of Third Party Confidential Information. The Participant hereby represents and warrants that (a) the execution, delivery and performance of this Agreement by the Participant and the execution of the Company's business plan by the Participant do not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order or judgment to which the Participant is a party or by which the Participant is

bound, (b) the Participant is not a party to or bound by any employment agreement, non-compete agreement or confidentiality agreement with any person or entity other than the Company or its Affiliates, and (c) this Agreement constitutes the valid and binding obligation of the Participant, enforceable against the Participant in accordance with its terms. The Participant shall not improperly use any confidential information or trade secrets of any third party in connection with the performance of the Participant's duties. The Participant hereby acknowledges and represents that the Participant has had the opportunity to consult with independent legal counsel regarding the Participant's rights and obligations under this Agreement and fully understands the terms and conditions contained herein.

12.     Enforcement. If, at the time of enforcement of any of Section 7 through Section 11, a court or an arbitrator shall hold that the duration, scope or area restrictions stated therein are unreasonable under the circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court or arbitrator shall be allowed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by law. Because the Participant's services are unique and because the Participant has access to Confidential Information, the parties hereto agree that money damages would not be an adequate remedy for any breach of this Agreement. Therefore, in the event of a breach or threatened breach of this Agreement, the Company or its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof (without posting a bond or other security).

13.     No Right to Continued Service. The granting of the Option shall impose no obligation on the Company or any Subsidiary to continue the employment of the Participant and shall not lessen or affect any right that the Company or any Subsidiary may have to terminate the employment of the Participant.

14.     Withholding. The Company shall have the power and the right to deduct or withhold automatically from any payment or Shares deliverable under this Award Agreement, or require the Participant to remit to the Company, the minimum statutory amount to satisfy federal, state, and local taxes, domestic or foreign, required by law or regulation to be withheld with respect to any taxable event arising as a result of this Award Agreement. The Participant may elect, subject to the approval of the Committee, in its sole discretion, to satisfy the withholding requirement, in whole or in part, by having the Company withhold Shares having a Fair Market Value equal to the minimum statutory total tax that could be imposed in connection with any such taxable event.

15.     Transferability. Unless otherwise determined by the Committee, the Participant shall not be permitted to transfer or assign the Option except in the event of death and in accordance with Section 14.5 of the Plan.

16.     Adjustment of Option. Adjustments to the Options (or any Shares underlying the Option) shall be made in accordance with the terms of the Plan.

17.     Definitions. For purposes of this Award Agreement:

a.     "Advent Stockholders Securities" means the equity securities and, if any, debt securities of the Company acquired by the Advent Stockholders, whether acquired before or after the Date of Grant.

6

b.      **"Business"** means the business of the Company and its Subsidiaries as currently conducted on the date hereof, as conducted within the five (5) years prior to the date hereof, or which the Board has authorized the Company to develop or pursue (by acquisition or otherwise).

c.      **"Measurement Date"** means any date upon which Proceeds are received by the Advent Stockholders.

d.      **"MOI"** means, as of any Measurement Date, the quotient obtained by dividing (i) the sum of Proceeds received on such Measurement Date and all prior Measurement Dates, by (ii) the Principal Investment.

e.      **"Permanent Disability"** means a determination by independent competent medical authority (selected by the Board) that the Participant is unable to perform his duties and in all reasonable medical likelihood such inability shall continue for a period in excess of 120 days in any 365 day period; provided, that, if the Participant has an employment agreement that defines "Permanent Disability" or a like term, "Permanent Disability" shall have the meaning set forth in such agreement.

f.      **"Principal Investment"** means the sum, without duplication, of: (i) the aggregate consideration paid by the Advent Stockholders to acquire the Advent Stockholders Securities, plus (ii) the amount of cash and the value (as determined by the Board in good faith) of any property contributed by the Advent Stockholders to the Company, whether contributed before or after the Date of Grant.

g.      **"Proceeds"** means, without duplication: (i) cash proceeds actually received by the Advent Stockholders or their Affiliates from the disposition of the Advent Stockholders Securities, net of Unreimbursed Transaction Expenses, (ii) cash dividends and other cash distributions actually received by the Advent Stockholders or their Affiliates in respect of the Advent Stockholders Securities, and (iii) cash proceeds actually received by the Advent Stockholders or their Affiliates from the disposition of any non-cash proceeds (including non-cash dividends or other non-cash distributions) received in exchange for or in respect of the Advent Stockholders Securities (net of Unreimbursed Transaction Expenses). For the avoidance of doubt, any property other than cash (including marketable securities) that the Advent Stockholders or their Affiliates receive or retain in connection with a Change of Control or otherwise shall not be treated as Proceeds received by the Advent Stockholders or their Affiliates, however, cash received by the Advent Stockholders or their Affiliates from the disposition of such property shall be treated as Proceeds, if any, if and when such cash actually is received by the Advent Stockholders or their Affiliates.

h.      **"Public Offering"** has the meaning set forth in the Stockholders Agreement.

i.      **"Unreimbursed Transaction Expenses"** means all reasonable legal, accounting and investment banking fees, other than amounts paid to the Advent Stockholders and their Affiliates, that are not reimbursed by unrelated third parties.

18.      Option Subject to Plan.  By entering into this Award Agreement the Participant agrees and acknowledges that the Participant has received and read a copy of the Plan.  The Option is subject to the terms and conditions of the Plan.  In the event of a conflict between any term hereof and a term of the Plan, the applicable term of the Plan shall govern and prevail.

19.      Choice of Law.  This Award Agreement, and all claims or causes of action or other matters that may be based upon, arise out of or relate to this Award Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, excluding any conflict or choice of law

7

rule or principle that might otherwise refer construction or interpretation thereof to the substantive laws of another jurisdiction.

20.  Consent to Jurisdiction. The Company and the Participant, by his or her execution hereof, (a) hereby irrevocably submit to the exclusive jurisdiction of the state and federal courts in the State of Delaware for the purposes of any claim or action arising out of or based upon this Award Agreement or relating to the subject matter hereof, (b) hereby waive, to the extent not prohibited by applicable law, and agree not to assert by way of motion, as a defense or otherwise, in any such claim or action, any claim that it or he is not subject personally to the jurisdiction of the above-named courts, that its, his or her property is exempt or immune from attachment or execution, that any such proceeding brought in the above-named court is improper or that this Award Agreement or the subject matter hereof may not be enforced in or by such court and (c) hereby agree not to commence any claim or action arising out of or based upon this Award Agreement or relating to the subject matter hereof other than before the above-named courts nor to make any motion or take any other action seeking or intending to cause the transfer or removal of any such claim or action to any court other than the above-named courts whether on the grounds of inconvenient forum or otherwise. The Company and the Participant hereby consent to service of process in any such proceeding, and agree that service of process by registered or certified mail, return receipt requested, at its address specified pursuant to Section 23 is reasonably calculated to give actual notice.

21.  WAIVER OF JURY TRIAL. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES AND COVENANTS THAT HE SHE OR IT SHALL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE OR ACTION, CLAIM, CAUSE OF ACTION OR SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED HEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING. EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTY HERETO THAT THIS SECTION 21 CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH THEY ARE RELYING AND SHALL RELY IN ENTERING INTO THIS AGREEMENT. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 21 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

22.  Shares Not Registered. Shares shall not be issued pursuant to this Award Agreement unless the issuance and delivery of such Shares comply with (or are exempt from) all applicable requirements of law, including, without limitation, the Securities Act of 1933, as amended, the rules and regulations promulgated thereunder, state securities laws and regulations, and the regulations of any stock exchange or other securities market on which the Company's securities may then be traded. The Company shall not be obligated to file any registration statement under any applicable securities laws to permit the purchase or issuance of any Shares, and accordingly any certificates for Shares may have an appropriate legend or statement of applicable restrictions endorsed thereon. If the Company deems it necessary to ensure that the issuance of Shares under this Award Agreement is not required to be registered under any applicable securities laws, the Participant shall deliver to the Company an agreement containing such representations, warranties and covenants as the Company may reasonably require.

23.  Notices. Any notice or other communication provided for herein or given hereunder to a party hereto must be in writing, and shall be deemed to have been given (a) when personally delivered or delivered by facsimile transmission with confirmation of delivery, (b) one (1) business day after deposit

with Federal Express or similar overnight courier service, or (c) three (3) business days after being mailed by first class mail, return receipt requested. A notice shall be addressed to the Company at its principal executive office, attention Chief Executive Officer and to the Participant at the address that he or she most recently provided to the Company.

24.     Entire Agreement. This Award Agreement, including Exhibit A attached hereto and the Plan, constitute the entire agreement and understanding among the parties hereto in respect of the subject matter hereof and supersede all prior and contemporaneous arrangements, agreements and understandings, whether oral or written and whether express or implied, and whether in term sheets, presentations or otherwise, among the parties hereto, or between any of them, with respect to the subject matter hereof; provided, that, the Participant shall continue to be bound by any other confidentiality, non-competition, non-solicitation and other similar restrictive covenants contained in any other agreements between the Participant and the Company, its Affiliates and their respective predecessors to which the Participant is bound. In the event of any inconsistency between any restrictive covenants contained herein and any restrictive covenants contained in such other agreements, that obligation which is most restrictive upon the Participant shall control.

25.     Amendment; Waiver. No amendment or modification of any term of this Award Agreement shall be effective unless signed in writing by or on behalf of the Company and the Participant, except that the Company may amend or modify this Award Agreement without the Participant's consent in accordance with the terms of the Plan or as otherwise set forth herein. No waiver of any breach or condition of this Award Agreement shall be deemed to be a waiver of any other or subsequent breach or condition whether of like or different nature.

26.     Successors and Assigns; No Third Party Beneficiaries. The provisions of this Award Agreement shall inure to the benefit of, and be binding upon, the Company and its successors and assigns and upon the Participant and the Participant's heirs, successors, legal representatives and permitted assigns. Nothing in this Award Agreement, express or implied, is intended to confer on any person other than the Company and the Participant, and their respective heirs, successors, legal representatives and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Award Agreement.

27.     Signature in Counterparts. This Award Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

*          *          *

IN WITNESS WHEREOF, the parties hereto have executed this Award Agreement.

PATRIOT SUPPLY HOLDINGS, INC.

By: _____
Claude A. S. Hornsby
Chief Executive Officer

Agreed and acknowledged as

of the date first above written:

_____            12/18/12
Scott Hilburn

F:\Morrison LLC\Patriot Supply\Option Plan\Option Award Agreement (S. Hilburn).doc

10

# APPENDIX

# EXHIBIT 6

## Ramirez, Donna

| | |
|---|---|
| **From:** | Mike Anthony <mikea@morsco.com> |
| **Sent:** | Wednesday, December 19, 2012 6:59 AM |
| **To:** | Chip Hornsby |
| **Subject:** | mike anthony |
| **Attachments:** | kilgore@morsco.com_20121219_080051.tif |

Thanks!

-----Original Message-----
From: kilgore@morsco.com [mailto:kilgore@morsco.com]
Sent: Wednesday, December 19, 2012 7:01 AM
To: mikea@morsco.com
Subject: Scanned image from MX-M453N

Reply to: kilgore@morsco.com <kilgore@morsco.com> Device Name: Not Set
Device Model: MX-M453N
Location: Not Set

File Format: TIFF MMR(G4)
Resolution: 200dpi x 200dpi

Attached file is scanned image in TIFF format.

1


PENGAD-Bayonne, N. J.
EXHIBIT
17
MORRISON

Patriot Supply Holdings, Inc.
2012 Stock Option Plan

NONQUALIFIED STOCK OPTION AWARD AGREEMENT

THIS AGREEMENT (this "**Award Agreement**"), is made effective as of December 10, 2012 (the "**Date of Grant**"), by and between Patriot Supply Holdings, Inc., a Delaware corporation (the "**Company**"), and Mike Anthony (the "**Participant**"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Patriot Supply Holdings, Inc. 2012 Stock Option Plan (the "**Plan**").

R E C I T A L S:

WHEREAS, the Committee has determined that it would be in the best interests of the Company and its stockholders to grant the option provided for herein to the Participant pursuant to the Plan and the terms set forth herein.

NOW THEREFORE, in consideration of the mutual covenants hereinafter set forth, the parties agree as follows:

1. Grant of the Option. The Company hereby grants to the Participant the right and option to purchase, on the terms and conditions set forth in the Plan and this Award Agreement, all or any part of an aggregate of **50** Shares (the "**Option**") at an Option Price of $1,130.00 per Share. Fifty percent (50%) of the Option shall be subject to time-based vesting criteria (the "**Time Option**") and fifty percent (50%) of the Option shall be subject to both time-based and performance-based vesting criteria (the "**Performance Option**"). The Option is intended to be a Nonqualified Stock Option.

2. Vesting. At any time, the portion of the Option which has become vested is hereinafter referred to as the "**Vested Portion.**" Subject to the terms set forth in the Plan and this Award Agreement, the Option shall vest as follows:

 a. Time Option.

  i. General. The Time Option shall vest in five (5) equal annual installments on each of the first five (5) anniversaries of the Date of Grant, subject to the Participant's continued employment by the Company or its Subsidiaries through the applicable vesting date, such that twenty percent (20%) of the Time Option shall vest on each vesting date.

  ii. Change of Control. The Time Option shall vest in full upon the consummation of a Change of Control, subject to the Participant's continued employment by the Company or its Subsidiaries through the date the Change of Control is consummated.

  iii. Death of Permanent Disability. In the event that the Participant's employment with the Company or its Subsidiaries terminates due to death or Permanent Disability, the portion of the Time Option that was scheduled to vest pursuant to Section 2(a)(i) above during the one (1) year period following the date of the Participant's termination of employment shall vest upon such termination date.

 b. Performance Option. On each Measurement Date, the portion of the Performance Option that has vested shall be determined as set forth below. In no event shall any

IN WITNESS WHEREOF, the parties hereto have executed this Award Agreement.

PATRIOT SUPPLY HOLDINGS, INC.

By: _____
Claude A. S. Hornsby
Chief Executive Officer

Agreed and acknowledged as

of the date first above written:

_____
Mike Anthony

# APPENDIX
# EXHIBIT 7

## Ramirez, Donna

| | |
|---|---|
| **From:** | Scott Hilburn <scotth@morsco.com> |
| **Sent:** | Tuesday, December 18, 2012 8:45 AM |
| **To:** | Chip Hornsby |
| **Subject:** | Fwd: Scanned image from 22-sharp-copier |
| **Attachments:** | AR-M455N_20121218_090542.pdf |

Chip i have attached the signed copy of the stock option agreement ,if i need to send the original pleas let me know. Once again i wont to thank you for this opportunity to be a part of our future growth.
Scott Hilburn


-------- Original Message --------
   **Subject:**Scanned image from 22-sharp-copier
      **Date:**Tue, 18 Dec 2012 09:05:42 -0600
   **From:**tyler@morsco.com
**Reply-To:**<tyler@morsco.com>
     **To:**scotth@morsco.com


```
DEVICE NAME: 22-sharp-copier
DEVICE MODEL: SHARP AR-M455N
LOCATION: Morrison Supply, Tyler, TX

FILE FORMAT: PDF MMR(G4)
RESOLUTION: 200dpi x 200dpi

Attached file is scanned image in PDF format.
This file can be read by Adobe Acrobat Reader.
The reader can be downloaded from the following URL:

        http://www.adobe.com/
```



EXHIBIT BB 20 MORRISON PENGAD-Bayonne, N. J.

1

IN WITNESS WHEREOF, the parties hereto have executed this Award Agreement.

PATRIOT SUPPLY HOLDINGS, INC.

By: _____
Claude A. S. Hornsby
Chief Executive Officer

Agreed and acknowledged as

of the date first above written:

12/18/12

_____
Scott Hilburn

# APPENDIX

# EXHIBIT 8

Cause No. 15-0792-A

| | | |
|---|---|---|
| SCOTT HILBURN and | ) | IN THE DISTRICT COURT |
| MIKE ANTHONY | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MORRISON SUPPLY COMPANY, LLC | ) | 7' JUDICIAL DISTRICT |
| and PATRIOT SUPPLY HOLDINGS, INC. | ) | |
| | ) | |
| | ) | |
| Defendants | ) | SMITH COUNTY, TEXAS |
| | ) | |

## AFFIDAVIT OF VAN KELLEY

Having been duly sworn, Van Kelley declared the following under oath:

1.      I am over the age of twenty-one, competent to make this affidavit and have personal knowledge of the truth of the contents of this affidavit.

2.      am a licensed private investigator. I was retained by Morrison Supply Company to determine whether Mike Anthony and Scott Hilburn are employed by National Wholesale Supply.

3.      On May 27, 2015, I observed Mike Anthony at the National Wholesale Supply facility located at 300 Southport Road, Kilgore, Toms. I observed Mr. Anthony walk in and out of the facility several times during the course of the day and engage in what appeared to be housekeeping activities such as picking up trash or cleaning off door mats. At approximately 5:35 p.m., Mr. Anthony left the facility through the front door in a vehicle that had been parked there all day.

4.      On June 19, 2015, I called the National Wholesale facility with the phone number of 903.238.8410 (which is the number that National Wholesale has posted on its website for its

Tyler branch) and asked to speak with Scott Hilburn. The individual on the phone indicated that Scott Hilburn was working at the Tyler location. On the afternoon of June 19, 2015, I observed Scott Hilburn at the National Wholesale location at 13240 Highway 110 South, Tyler, Texas. Mr. Hilburn was operating a forklift and moving supplies around outside the building.

      Further affiant sayeth naught.

_____
**Van Kelley**

SWORN TO AND SUBSCRIBED before me on Rule _14_, 2015.

SHANNON MAY
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Expires 10.14-2018

Notary ' bite
Notary's Printed Name:
_Shannon May_
My commission expires: _10-14-18_

2